**Lois MILLSPAUGH and Tina Dyson,**
**Plaintiffs–Appellants,**

v.

**COUNTY DEPARTMENT OF PUBLIC**
**WELFARE OF WABASH COUNTY,**
**et al., Defendants–Appellees.**

**No. 90–2910.**

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1991.

Decided July 15, 1991.

**1173**

lee Wabash County Dept. of Public Welfare.

Gregory R. Lyman, Singleton, Crist, Patterson, Austgen & Lyman, Munster, Ind., for defendant-appellee Manetta Tucker.

Before EASTERBROOK and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Lois Millspaugh and Tina Dyson belong to the Faith Ministries and travel at God's direction. Members of the Ministries give away all of their worldly possessions, believing that God will provide for them at each destination. Between late 1982 and early 1984 Lois Millspaugh, her daughters Jean and Paula; Tina Dyson, her daughters Vicki and Renee; and Jewell McLaughlin lived together in Wabash, Indiana. The four daughters attended public school, receiving high grades (in 1985 Jean was valedictorian of her high school class).

On February 2, 1984, the County's Department of Public Welfare received a tip that the mothers had given away their possessions and that the children lacked food. Caseworkers quickly determined that the house had been stripped of all furnishings (even the kitchen sink had vanished), and that the three adults had departed for Kokomo, taking the four children with them. The children had been removed from school without notice—and, as it turned out, without plans to enroll them in another school. Rev. Bob Merrill in Kokomo told the Department that the seven had arrived with no money and no possessions other than the clothes they were wearing; Rev. Merrill fed and housed them for a day, after which they left for Indianapolis. This was too much for the Department, which obtained an *ex parte* order from a state court directing the Department to take the children into custody so that the court could determine whether they were "children in need of services", see Ind.Code § 31-6-4-10. Such a finding would support their placement in foster homes. Manetta Tucker, one of the Department's social

John Johnston, Johnston, Lehman & Guenin, Wabash, Ind., for plaintiffs-appellants.

Robert J. Palmer, May, Oberfell & Lorber, South Bend, Ind., for defendant-appel-

workers, signed the application for the order.

Police found the children in Indianapolis on February 8. The state judge had set a hearing for February 10; we must assume that the police did not serve the mothers with that order or otherwise notify them of the court date. Tucker went to Indianapolis with Paul Wildridge, a friend of the families, and retrieved the children. The mothers continued on their mission, which left them no time to contact the Department. They made no effort to get in touch before February 17, although they did ask the Department to send messages through Wildridge. The mothers say that they received few messages and blame Tucker; Tucker says she left word with Wildridge and blames him; the record includes some written notices sent to Wildridge and returned unopened. At all events, the proceedings were to remain one-sided for some time.

A physician in Wabash pronounced the children healthy, and a clinical psychologist thought them free of emotional or psychological problems. Tucker did not find this reassuring and pressed the motion to have the children separated from their mothers—without informing the court of these reports. The judge made a preliminary finding that the children were in need of services and called for more studies and hearings. The mothers traveled to Ohio, Virginia, Tennessee, North Carolina, Florida, and several suburbs of Washington, D.C., without checking on their children. Both skipped a hearing on March 16, because, they explained, they were on a mission for God, who did not wish them to be in Indiana. Tucker and Lois Millspaugh did speak by telephone on March 16, and Charles Millspaugh, the father of Jean and Paula, appeared at the hearing. There were more hearings, none of which the mothers attended (and for each hearing there is a dispute about whether the mothers had been told, directly or through Wildridge, in time to attend).

In late 1984 the court held a hearing at which the mothers were represented by counsel who had been engaged during a brief visit Lois Millspaugh paid to Indiana. The court vacated its earlier orders, concluding that the mothers lacked sufficient notice, and re-started the process. Meanwhile the mothers were on the move, traveling to England, France, Holland, Switzerland, Italy, Greece, Jerusalem, Tel Aviv, Bangkok, Seoul, and Honolulu. Tina Dyson returned to Wabash in May 1985. Lois Millspaugh was in Hawaii when she learned in July 1985 that these additional proceedings had ended in an order remanding the three minor children to their mothers' custody (Jean Millspaugh had turned 18 shortly before). Lois Millspaugh took custody of her daughter Paula on July 22 after returning via Maryland; eighteen days later Paula ran away, rejoining her foster family. Vicki Dyson also wanted to stay with her foster parents; Tina allowed Vicki to do so. The record does not reveal whether Paula Millspaugh and Renee Dyson have returned to their mothers.

The mothers filed this suit under 42 U.S.C. § 1983, contending that Tucker and the Department deprived them of their children without due process of law. The mothers also believe that Tucker and other social workers disapproved of their faith and took the children both to turn the children away from the religion and to induce the mothers to give up their travels. All of this violates the first amendment, the mothers submit. The district court granted the defendants' motion for summary judgment. 746 F.Supp. 832 (N.D.Ind. 1990).

■ The district court concluded that the mothers had not established a causal link between the Department's policies and their loss. Because the Department may be liable only on account of its own policies, and not vicariously for the acts of Tucker (who is not a "policymaker"), *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the mothers needed to identify an unconstitutional policy and show how its application caused their injury. We agree with the district court that the mothers did neither of these things. In this court the mothers have not identified any rule or policy of the Department that they believe violates the Constitution; they contend, rather, that the

Department sorely erred in its handling of their case. That is not enough under *Monell.*

Tucker prevailed because the district court concluded that she is entitled to immunity as a matter of law. Finessing the question whether the immunity should be qualified or absolute, the district judge held that Tucker would prevail under either standard. The mothers contest this, pointing to a list of things it was clearly established that social workers should not do. They contend that Tucker initiated the proceedings without adequate cause, lied in her application for the *ex parte* order, failed to notify them of hearings or furnish the court with medical and psychological reports showing that the children did not need care, and persevered in the case because of animosity toward their religion rather than concern for the children's welfare. All of these things, the mothers submit, were so clearly unlawful that the objective standard of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), precludes immunity.

■ Some of the mothers' arguments concern Tucker's behavior in court. They say that she (1) failed to furnish the court with material that would have been favorable to parental custody, (2) pursued the litigation after it should have been clear that the mothers were entitled to custody, (3) pursued the litigation for an improper motive, and (4) neglected to ensure that the mothers received adequate notice of hearings. In all of these respects, Tucker acted as both a prosecutor and witness. She made arguments to the court, furnished or withheld evidence, and so on. Prosecutors and witnesses are absolutely immune from liability in damages on account of their acts in court. We held in *Buckley v. Fitzsimmons,* 919 F.2d 1230, 1239–45 (7th Cir. 1990), that the dividing line between abso-

lute and qualified immunity is whether the injury depends on the judicial decision. If there would be no loss but for the judge's acts, then the prosecutor or witness who induces the judge to act has absolute immunity. We drew this conclusion from *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), which discusses prosecutorial immunity, and *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), which discusses witness immunity. After oral argument in this case the Supreme Court decided *Burns v. Reed,* —— U.S. ——, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), which reinforces *Buckley*'s approach. *Burns* held a lawyer absolutely immune from liability for acts while representing the state during a probable cause hearing but only qualifiedly immune for giving legal advice to the police; the principal distinction was that the advice (and the officers' acts in reliance on that advice) could cause injury without the mediation of a judge.

Most of what Tucker did could yield no harm to the mothers unless the court agreed. Her motives in asking the court to do certain things, and her selection of evidence to present, lie at the core of the subjects to which absolute immunity applies. Even failure to supply adequate information to the mothers (assuming that Tucker rather than Wildridge bears the responsibility) is something that could cause no loss unless the court pressed on to decision. The judge knew that the mothers were not there; the judge knew that they were unrepresented, and that communication with them was sporadic. Whether to proceed in such circumstances is a judicial decision. We may assume that Tucker acted out of improper motives and misled the court.[†] Still, immunity that applies only when the defendant did no wrong is no immunity at all.

■ Protection does not vanish when the proceeding is *ex parte*; *Burns* observes

---

† Whether in a civil case the government must present evidence favorable to its adversary is a question we bypass. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires a criminal prosecutor to alert the defendant to exculpatory evidence, at least if the defendant made the right request. *United States*

*v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). There is so far no parallel to *Brady* in civil litigation. The approach we take to this case eliminates any need to consider whether the due process clause establishes obligations comparable to *Brady* in civil cases.

that absolute immunity covers testimony and prosecutorial acts before a grand jury, which conducts *ex parte* inquiries. 111 S.Ct. at 1941 & n. 6. We therefore agree with decisions holding that social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court. *Malchowski v. Keene,* 787 F.2d 704, 711–14 (1st Cir.1986); *Walden v. Wishengrad,* 745 F.2d 149 (2d Cir.1984); *Vosburg v. Department of Social Services,* 884 F.2d 133 (4th Cir.1989); *Stem v. Ahearn,* 908 F.2d 1, 6 (5th Cir.1990); *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984); *Salyer v. Patrick,* 874 F.2d 374 (6th Cir.1989); *Meyers v. Contra Costa County Department of Social Services,* 812 F.2d 1154 (9th Cir. 1987); *Coverdell v. Department of Social & Health Services,* 834 F.2d 758, 762–65 (9th Cir.1987). See also *K.H. v. Morgan,* 914 F.2d 846, 854 (7th Cir.1990) (assuming that absolute immunity applies to caseworkers who initiate child-removal proceedings).

Tucker's application for the order initiating the case, and her journey to Indianapolis to obtain custody of the children, call for different analysis. The application for the initial order was much like a police officer's affidavit seeking a search warrant, which we know from *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), falls outside the scope of absolute immunity. Sallying forth to collect the children is no different from seizing evidence on the authority of a warrant, which again is covered by qualified immunity only. Both *Burns* and *Buckley* reinforce the conclusion that absolute immunity does not protect the gathering of evidence, even though the acts of presenting that evidence to (or withholding it from) the court receive greater protection. Social workers must settle for qualified immunity when taking initial custody of children. Accord, *Austin v. Borel,* 830 F.2d 1356, 1361–62 (5th Cir.1987); *Caldwell v. LeFaver,* 928 F.2d 331 (9th Cir.1991); *Speilman v. Hildebrand,* 873 F.2d 1377, 1382–83 (10th Cir.1989); see also *K.H. v. Morgan,* 914 F.2d at 854.

Still, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. See also *Burns,* 111 S.Ct. at 1944. This record does not establish anything of the sort, even giving the mothers the benefit of all reasonable inferences. The Department received a tip. Tucker investigated and found that the mothers' house had been stripped to the walls. The children had vanished from school. The minister who furnished food and lodging for a night in Kokomo reported that the children and their mothers had no money and no possessions except the clothes they were wearing, and that the mothers planned to travel without any stated itinerary or means to provide for their children. That was ample basis for taking the initial steps to determine whether the children should remain in their mothers' custody. As the immunity standard under *Harlow* and *Anderson* is objective, it does not matter whether Tucker had some additional (and constitutionally dubious) reason for acting as she did.

Indeed, the removal of the children from school was sufficient by itself to support Tucker's initiative. State law required the mothers to furnish their children with an education. Ind.Code § 20–8.1–3–33; see also Ind.Code § 35–46–1–4(a)(4) (depriving children of education is a Class D felony). All signs pointed to extended wandering without education for the kids. Even now the mothers do not explain how they were going to supply the required education. The mothers' religion does not forbid education, cf. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); the children were in public school for years. Although the mothers assert that they planned to enroll the four in correspondence courses, they concede that they lacked the necessary funds—and they do not explain how the educational materials were going to reach them on their sojourn, characterized as it was by frequent and impromptu changes of address.

Social workers often act on limited information; those who tarry, or resolve all doubts in favor of the parents, chance en-

during damage to the children. Cf. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Immunity helps social workers put their private interests aside and concentrate on the welfare of children. Unfortunately, immunity also may embolden social workers to pursue their private agendas—as the mothers say Tucker did, using her position to throttle unorthodox religious practices. One effect is inseparable from the other. Absolute immunity is appropriate when the social worker presents the case to a court, which can protect parents against misuse of public position. Knowledge that damages are unavailable induces the parties to present all arguments to that tribunal. The mothers thought that a higher duty prevented them from attending court in Indiana, but this does not require a federal court to ignore those judicial proceedings and start anew. Qualified immunity applies to the seizure of the children in Indianapolis, which would have injured the mothers even had the state court resolved all questions in their favor. Because Tucker had an objectively reasonable basis for her acts, the judgment is

AFFIRMED.