

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-26-1999

# Miller v. City of Philadelphia

Precedential or Non-Precedential:

Docket 98-1020

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Miller v. City of Philadelphia" (1999). *1999 Decisions.* Paper 109.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/109

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 26, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1020

SANDRA MILLER; COREY MILLER, a Minor, by and
through his Mother and Natural Guardian, SANDRA
MILLER; THOMAS MILLER, a Minor, by and through
his Mother and Natural Guardian, SANDRA MILLER;
DAKOTA BRADLEY, a Minor, by and through his Mother
and Natural Guardian, SANDRA MILLER;
DAVID L. DERATZIAN, ESQUIRE

v.

THE CITY OF PHILADELPHIA; PHILADELPHIA
DEPARTMENT OF HUMAN SERVICES; OWEN SCHEER;
CHILDREN'S HOSPITAL OF PHILADELPHIA; HUTTON,
OFFICER; MARC CARROLL, SGT.; RODNEY NICHOLAS

Sandra Miller, Corey Miller, Thomas Miller

and Dakota Bradley,
        Appellants

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 96-cv-03578)
District Judge: William H. Yohn, Jr.

ARGUED OCTOBER 6, 1998

BEFORE: Becker, Chief Judge,
Nygaard, and Noonan,* Circuit Judges.
_____

*The Honorable John T. Noonan, Jr., Circuit Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.

(Filed April 26, 1999)

David L. Deratzian, Esq. (Argued)
2100 Locust Street
Philadelphia, PA 19103

Attorney for Appellants

Richard G. Feder, Esq.
Sarah E. Ricks, Esq. (Argued)
City of Philadelphia Law Department
1515 Arch Street
One Parkway Building, 17th Floor
Philadelphia, PA 19102

Charles T. Roessing, Esq. (Argued)
Mary G. March, Esq.
White & Williams
1500 Lancaster Avenue
Suite 206
Paoli, PA 19301

Attorneys for Appellees

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Appellants, Sandra Miller, her three children (Corey Miller, Thomas Miller and Dakota Bradley), and their attorney, David Deratzian, Esq., sued the City of Philadelphia, the Philadelphia Department of Human Services ("DHS"), DHS social worker Owen Scheer (collectively, the "City defendants"), the Children's Hospital of Philadelphia ("CHOP") and two CHOP security guards (collectively, the "CHOP defendants"), alleging violations of their procedural and substantive due process rights under 42 U.S.C. S 1983 and asserting various claims under state law.1 The claims arise from an emergency ex parte child

_____

1. Deratzian, who represents Appellants in this appeal, alleged a violation of his own Fourth Amendment rights, as well as assault and battery by the CHOP security guards. However, Deratzian did not appeal from the grant of summary judgment for the defendants; therefore, his claims are not before us.

custody hearing after which the City defendants removed two of Miller's children from her custody. The District Court dismissed the procedural due process claim and granted summary judgment on the remaining claims. Appellants raise issues related to their procedural and substantive due process claims and assert that the District Court engaged in improper credibility determinations. We will affirm.

I.

Tiny Tot Daycare personnel reported to Scheer their suspicion that Corey and Thomas Miller were victims of abuse. Scheer and Reginald Jackson, another DHS social worker, visited the day care center. Thomas and Corey each indicated that they had been hit by both their mother and her boyfriend, Derrick Schill. The owner of the day care center informed the social workers that previous injuries to the children had concerned the day care workers and that the center had videotaped some of the injuries. The next day, Scheer and Jackson returned to the center with Scheer's supervisor. Corey and Thomas repeated their statements. At his supervisor's request, Scheer then had the Miller children brought to CHOP for an examination.

Dr. Henretig, a CHOP physician, examined the children that evening and reported to Scheer, Jackson, social worker Amy Frank, and Deratzian that he had found no evidence of injury to Thomas or Dakota, but had found bruises on Corey and felt that a mark on Corey's back was suspicious. Dr. Henretig indicated that the mark had been made within the last twenty-four hours; however, he could not be certain whether Corey's injuries resulted from abuse or accident.

Scheer then called Assistant City Solicitor Debra Maser and told her what Dr. Henretig had said and what he had learned in his investigation. Maser next spoke with Dr. Henretig and then contacted an on-call emergency judge seeking an order to remove Miller's children from her custody, which the judge issued. At some point after Scheer's conversation with Maser, but before the order was issued, Scheer met with Dr. Henretig outside of the presence of Frank and Deratzian. Thereafter, the doctor issued a report of suspected abuse.

3

Approximately thirty-six hours after the removal order was issued, a detention hearing was held to determine whether the children should continue to remain in DHS custody. Before adjourning for the weekend, the attorney representing Miller at the hearing (not Deratzian) requested that Thomas Miller be released but conceded that a prima facie case of dependency had been established as to Corey. Thomas was returned to his mother's custody, but the judge upheld the restraining order and kept Corey in the custody of the state. Following a second day of testimony the next Monday, the judge dissolved the restraining order and returned Corey to his mother's custody, with the condition that Schill have no contact with Mrs. Miller or the children until a dependency hearing could be held to determine who should take custody of the children. Scheer was later reassigned from the Miller case. Thereafter, DHS sporadically pursued a dependency action against Miller, but ultimately dissolved the petition.

In their suit, Appellants alleged that Scheer violated their rights to procedural due process by refusing to allow them to participate in his telephone conversation with the City Solicitor. They alleged that he violated their rights to substantive due process by pursuing the investigation without probable cause, misrepresenting facts to Solicitor Maser, inducing CHOP to falsify records, and attempting to suborn perjury by Dr. Henretig.[2]

The District Court dismissed, under Fed. R. Civ. P. 12(b)(6), Appellants' procedural due process claim against the City defendants and held that Scheer had qualified immunity from Appellants' substantive due process claims to the extent that they alleged he pursued the Millers' case without probable cause. The Court declined, however, to dismiss the section 1983 substantive due process claims against Scheer for allegedly misrepresenting Dr. Henretig's

_____

2. In addition, they alleged civil rights, conspiracy, malicious prosecution, bodily injury and intentional infliction of emotional distress claims. Miller and Deratzian also alleged civil rights claims against the City and DHS independently for their policies and customs and for failure to adequately train their staff. The plaintiffs did not appeal from the District Court's grant of summary judgment on those claims, so those claims are not before us.

4

medical report, inducing the hospital to falsify records and attempting to suborn perjury. In doing so, the Court held that Scheer had neither absolute nor qualified immunity against these charges. The Court declined to dismiss the balance of the claims against the City. See Miller v. City of Philadelphia, 954 F. Supp. 1056, 1059-60 (E.D. Pa. 1997) [hereinafter Miller I].

Following discovery, the District Court granted summary judgment for defendants on Appellants' claims against DHS, their state law claims against the City, their section 1983 substantive due process claim and malicious prosecution claims against Scheer, and their section 1983 substantive due process and malicious prosecution claim against the City to the extent that those claims related to Scheer. See Miller v. City of Philadelphia, No. CIV.A.96-3578, 1997 WL 476352, at *2-*3 (E.D. Pa. Aug. 19, 1997) [hereinafter Miller II]. After this order was entered, Appellants did not oppose motions for summary judgment by the CHOP defendants3 and by the City defendants on the remaining claims against them. The Millers now contend that the District Court erred by dismissing their procedural due process claim, by granting qualified immunity to Scheer, and by making impermissible credibility determinations.

II. Procedural Due Process

The first issue is narrow. Although Appellants argue that their procedural due process rights were violated, they do not challenge the constitutionality of the Pennsylvania statute that sets forth the procedure to be followed in emergency child custody hearings,4 nor do they contend

_____

3. The Millers' claims against the CHOP defendants, based on an alleged conspiracy with the City defendants, were not addressed in the statement of issues in Appellants' brief or in the briefs themselves. Although Appellants asserted at oral argument that these claims were being appealed, we hold that they have been waived. See Southwestern Pa. Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997) ("[A]ppellate courts generally should not address legal issues that the parties have not developed through proper briefing.").

4. Initiating child custody proceedings by ex parte orders is generally constitutional if a prompt post-deprivation hearing is held. See, e.g.,

that DHS personnel failed to follow the statutory procedures for taking a child into custody. Instead, Appellants contend that the procedures adopted by DHS to implement the state statute are faulty because they did not ensure that either Miller or Deratzian, who were both present at the hospital and therefore clearly available, had the opportunity to participate in the emergency hearing before the judge. Our review of the District Court's decision to dismiss is plenary. In our view, this argument fails to raise a valid procedural due process claim.

Appellants contend that when a parent, or the parent's attorney, is available when the government applies for a restraining order, the government must allow the parent or the attorney to take part in the hearing. Such a requirement, they argue, would protect the parent's interest in the custody of their child without any significant burden on the government.

"The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.' " Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965)). Assessing whether due process has been given involves a weighing of the factors set forth by the Supreme Court in Mathews:

> first, the private interest that will be affected by the
> official action; second, the risk of an erroneous
> deprivation of such interest through the procedures

_____

Jordan v. Jackson, 15 F.3d 333, 343 (4th Cir. 1994) ("Due process . . . does not always require prior process."); Fitzgerald v. Williamson, 787 F.2d 403, 408 (8th Cir. 1986). Pennsylvania's Child Protective Services Law, 23 Pa. Cons. Stat. Ann. S 6301 et seq., and Juvenile Court Act, 42 Pa. Cons. Stat. Ann. S 6301 et seq., require that a hearing be held within seventy-two hours after an ex parte hearing that results in a child's removal from the home. See 23 Pa. Cons. Stat. Ann. S 6315(d); 42 Pa. Cons. Stat. Ann. S 6332(a). Although we have not considered Pennsylvania's statutory procedure, district courts in this circuit have found it constitutional. See Miller I, 954 F. Supp. at 1061 (citing various
cases in the Eastern District of Pennsylvania).

6

used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335, 96 S. Ct. at 903.

The private interest at stake springs from the parent-child relationship. The Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child." Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95 (1982); see also Croft v. Westmoreland County Children & Youth Serv., 103 F.3d 1123, 1125 (3d Cir. 1997). This interest, however, must be balanced against the state's interest in protecting children suspected of being abused. See, e.g., Croft, 103 F.3d at 1125; Millspaugh v. County Dept. of Public Welfare, 937 F.2d 1172, 1175-77 (7th Cir. 1991).

Appellants assert that ensuring that a parent (or her representative) will be heard under the instant circumstances would create little cost for the state. They point to the required flexibility of the due process standard for support. See Mathews, 424 U.S. at 334, 96 S. Ct. at 902 (" `[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600 (1972))). The Supreme Court has cautioned, however, that "[t]he interpretation and application of the Due Process clause are intensely practical matters," Gross v. Lopez, 419 U.S. 565, 578, 95 S. Ct. 729, 738 (1975) (emphasis added), and we must consider the results that a ruling for the Appellants here would have on all ex parte child custody hearings.

Here, the cost to the state is not the minimal one that Appellants suggest. The District Court specifically considered the practicality of requiring "the government to adopt special procedures depending on who was within the vicinity of the government official when he or she requests an emergency restraining order." Miller I, 954 F. Supp. at 1062.

7

> [Appellants'] proposed procedure would require case-by-case analysis, and would raise new issues such as the nature of the pre-deprivation hearing that the state would have to provide and when exactly a parent was available on site. Pre-deprivation hearings would frustrate the purpose of the Juvenile Act and would bog down the statute with "procedural technicalities and costly litigation." Consequently, although it may be preferable for DHS to allow the parent to participate in the request for an emergency order when he or she is present, the facts as alleged by plaintiffs do not establish a constitutional violation of the right to procedural due process.

Id. (citations omitted).

We agree. Although Appellants' argument is intuitively appealing, its strength lies in its pragmatic nature rather than its constitutional validity. We do not discount parents' strong interest in the custody of their children, but requiring that a parent or his attorney be included in emergency pre-deprivation hearings "when available" or "when at hand" would build delay into these time-sensitive hearings and encourage litigation over "availability." Such a requirement would thus inhibit, deter and, at times, subvert the crucial function of ex parte custody hearings -- protecting children who are in imminent danger of harm. We therefore conclude that the holding sought by Appellants would create a burden on the state that would not be justified by commensurate relief to the affected parents' rights.

III. Substantive Due Process

Appellants next challenge the District Court's dismissal of their substantive due process claim. The District Court held that Scheer was protected by qualified immunity against the claim that he pursued the investigation without probable cause.5 In its ruling, the court declined to apply

_____

5. The District Court denied Scheer qualified immunity for other acts alleged by Appellants, including misrepresenting Dr. Henretig's report to the City Solicitor and attempting to suborn perjury by the doctor. We

8

our decision in Croft v. Westmoreland County Children & Youth Serv., 103 F.3d at 1123. Our review of this decision is also plenary.

By basing the dismissal on qualified immunity-- an affirmative defense -- the District Court presumed the validity of the alleged due process violation. The proper approach, however, is to ascertain whether a constitutional violation has been alleged before determining if qualified immunity is available. See Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793 (1991); Larsen v. Senate of the Commonwealth of Pa., 154 F.3d 82, 86 (3d Cir. 1998) ("[W]hen a qualified immunity defense is raised a court first should determine whether the plaintiff has asserted a violation of a constitutional right at all.").

As noted, the Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child." Santosky, 455 U.S. at 753, 102 S. Ct. at 1394-95; see also Lehr v. Robertson, 463 U.S. 248, 257-58, 103 S. Ct. 2985, 2991 (1983). We, and other courts of appeals, have recognized this as a protectable interest. See, e.g., Croft, 103 F.3d at 1125; Gottlieb v. County of Orange, 84 F.3d 511, 517 (2d

_____

agree with the Court's holding that, even if Scheer did misrepresent the doctor's report to Solicitor Maser, Appellants failed to establish a causal
connection between the alleged misrepresentation and the Judge's decision to grant a separation order. See Miller II, 1997 WL 476352, at *4. Our precedents establish the necessity of a causal link between an alleged unconstitutional act and the harm that a plaintiff claims followed it. See, e.g., Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (noting that causation is a necessary element to a section 1983 claim). As the District Court noted, Appellants failed to produce any evidence that Scheer lied to Maser or attempted to convince Dr. Henretig to lie in his report of suspected abuse. See Miller II, 1997 WL 476352, at *4. Although there was ample opportunity, Appellants did not depose either Dr. Henretig or Solicitor Maser, both of whom would have had direct knowledge of any misstatements or misdeeds by Scheer. Moreover, Solicitor Maser spoke independently with Dr. Henretig to ascertain his opinion. This conversation should have served to expose any lies on the part of Scheer. In sum, any subsequent misstatements by Maser to the Judge during their telephone hearing would not have been caused by Scheer.

Cir. 1996); Darryl H. v. Coler, 801 F.2d 893, 901 (7th Cir. 1986) (recognizing the "legitimate expectations of the parents or other caretakers, protected by the fourteenth amendment, that their familial relationship will not be subject to unwarranted state intrusion"). To determine whether this right has been abridged, we must consider the governmental acts in question.

"The touchstone of due process is the protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976 (1974). In cases like this, where abusive action by a member of the executive branch is alleged, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." County of Sacramento v. Lewis, 118 S. Ct. 1708, 1716 (1998) (citation and internal quotation marks omitted). To generate liability, executive action must be so ill-conceived or malicious that it "shocks the conscience." Id. at 1717 (citing, inter alia, Rochin v. California, 342 U.S. 165, 172–73, 72 S. Ct. 205, 209–10 (1952)). Critically, under this standard, officials will not be held liable for actions that are merely negligent. See Lewis, 118 S. Ct. at 1718.

Although the "shocks the conscience" standard is problematic standing alone, it serves to "mark the beginning point in asking whether or not the objective character of certain conduct is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning." See id. at 1722 (Kennedy, J., concurring). The exact degree of wrongfulness necessary to reach the "conscience-shocking" level depends upon the circumstances of a particular case. In Lewis, wherein the parents of a motorcyclist who was killed in the course of a high speed chase by police alleged a due process violation by the police, the Supreme Court reviewed the standards that determine the liability of government actors in varying circumstances. Recognizing that negligence alone was never enough, the Court observed that activity "at the other end of the culpability spectrum" was more likely to lead to liability, but also recognized that liability may arise from the mid-range of culpability measurement. See id.

10

The Court compared the position of prison officials, who risk liability when they act with deliberate indifference to a prisoner's medical needs, see Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976), with the position of the police involved in the high-speed chase of the motorcyclist. The Court noted the vast differences in the circumstances surrounding the two types of executive actions:

> [I]n the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare.
>
> . . .
>
> [But] indifference may well not be enough for liability in the different circumstances of a case like this one. We have, indeed, found that deliberate indifference does not suffice for constitutional liability (albeit under the Eighth Amendment) even in prison circumstances when a prisoner's claim arises not from normal custody but from response to a violent disturbance.

118 S. Ct. at 1719.

Therefore, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another," id. at 1718, and the circumstances of each case are critical. A much higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks. In such instances, liability will only be applied when a "purpose to cause harm" is demonstrated. Id. at 1720.

We recognize that a social worker acting to separate parent and child does not usually act in the hyper-pressurized environment of a prison riot or a high-speed chase. However, he or she rarely will have the luxury of proceeding in a deliberate fashion, as prison medical officials can. As a result, in order for liability to attach, a social worker need not have acted with the "purpose to cause harm," but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed "shocks the conscience."

11

In Croft, 103 F.3d at 1123, we considered governmental intervention into the parent-child relationship. Based on a telephoned accusation, a social worker threatened to remove a child from the home if the father himself did not leave. By threatening this action, the social worker effectively removed the child from the parents' custody. This was done even though the social worker did not have grounds to believe that the child had been abused or was in imminent danger of being abused. See id. at 1126-27. Indeed, the social worker was acting solely on the basis of a sixth-level hearsay statement and had not personally formed an opinion as to whether abuse was likely. Breaking the parent-child bond under these circumstances, we held, was an arbitrary abuse of government power. See id. at 1127.

Although the plaintiffs argue that some of our language in Croft can be interpreted to sound in negligence, the holding may not be read to suggest that mere negligence by a social worker will violate a parent's or a child's substantive due process right. See Lewis, 118 S. Ct. at 1718 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). Croft assessed liability when a social worker acted to separate parent and child without any valid basis for doing so. In other words, decision-making by a social worker that is so clearly arbitrary, as was that in Croft, can properly be said to "shock the conscience" and, therefore, violates the substantive due process rights of the affected family. Thus, to the extent that Appellants claimed a violation of their due process rights because Scheer acted negligently or lacked objectively reasonable grounds to pursue the case against them (and their appeal indeed focuses on this issue), they did not state a valid claim.6

_____

6. Because we determine that Appellants' argument on appeal does not assert a valid claim of a constitutional violation, we do not reach the issue of qualified immunity. While Appellants' original complaint may be construed to assert that Scheer acted without any grounds for doing so, their appeal focuses on the application of Croft and argues that its holding "require[s] inquiry into the reasonableness of the actions of the social worker." Appellants' Brief at 23.

12

Viewing the facts adduced against Scheer in the light most favorable to the plaintiffs, Scheer asked the children leading questions when he first visited their day care center in response to allegations of abuse. He requested that Miller produce her three children for examination at the hospital even though he suspected that only one of the children was being abused. He met in secret with a hospital social worker. He excluded Deratzian from the area outside the examination room. Though he was informed by Dr. Henretig that Henretig could not be sure whether Corey received his bruises accidentally or whether he was physically abused, Scheer still called City Solicitor Maser so that she could seek a restraining order for the children. A Child Advocate Social Worker thought, based on Henretig's statements, that the children would be allowed to go home

_____

We reject the City's argument that, based on our recent decision in Ernst v. Child & Youth Services, 108 F.3d 486, 494 (3d Cir.), cert. denied,
118 S. Ct. 139 (1997), Scheer is absolutely immune for his actions. This case is distinguishable from Ernst. Absolute immunity protects government officials for certain acts they perform that are closely associated to the judicial process. See, e.g., Imbler v. Pachtman, 424 U.S.
409, 430, 96 S. Ct. 984, 995 (1976). In Ernst, we held that social workers were absolutely immune "for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency hearings." Ernst, 108 F.3d at 495. The immunity extended to "the formulation and presentation of recommendations to the court in the course of such proceedings." Id. We reasoned that "the functions performed by [child social workers] in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings." Id.

The District Court found that Scheer's "alleged tortious conduct . . . took place during the investigative phase of the child custody proceeding." See Miller I, 954 F. Supp. at 1063. As we recognized in Ernst, absolute immunity does not extend to investigative or administrative acts. See 108 F.3d at 497 n.7. Here, Scheer passed the information he had gathered on to Solicitor Maser. Maser also gathered information from other sources, including Dr. Henretig and social worker Jackson, and then presented the evidence she had to the Judge. Scheer made no presentations or recommendations to the court. As a result, Scheer's acts were not analogous to those court-related functions normally performed by a prosecutor, and at times performed by social workers, and he cannot receive absolute immunity.

13

following the doctor's examination. Finally, Scheer received reviews in his DHS personnel evaluations indicating that he had problems with co-workers and did not always follow proper procedures.

We conclude that, even if all of the facts alleged above were true, Scheer did not act in a way that shocks the conscience. Scheer's progress reports are inapposite to his mindset in this case, and the social worker's statements were based solely on the doctor's opinion following the examination. In contrast, substantial evidence indicated that Scheer reasonably believed that the children were in danger of abuse, including the day care center's videotapes of bruises on Corey, Dr. Henretig's opinion, and the lengthy history of Corey's abuse by Schill. In a properly supported motion for summary judgment, the non-movant must produce some (that is, more than a "scintilla" of) evidence in support of his position. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 2514 (1986) (noting that "[t]his is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery"). On these facts, we conclude that the plaintiffs have failed to state a viable substantive due process claim.7

IV.

In sum, we will affirm because the Appellants' procedural due process rights were not violated and because Appellants have not pointed to sufficient evidence of the predicate conscience-shocking behavior to support a substantive due process claim. Finally, there was no error

_____

7. Plaintiffs also contend on appeal that the District Court erred by making credibility judgments in its summary judgment ruling. Specifically, they argue that the District Court should not have determined that the actions of Scheer were reasonable or made in good faith. We reject this argument summarily. As discussed above, plaintiffs proffered no evidence of acts by Scheer that rose to a level of arbitrariness that shocks the conscience and therefore failed to state the kind of deprivation that might rise to the level of a constitutional violation.

14

in the District Court's construction of Scheer's behavior in this case.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit