# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MICHAEL A. WILKINS**
Broyles Kight & Ricafort, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELIZABETH ROGERS**
Deputy Attorney General
Indianapolis, Indiana

FILED

Oct 17 2012, 8:50 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| D.L., GLEN BLACK, ANN BLACK, STEVEN LUCAS, and K.L., by her Next Friend, D.L., | ) ) ) ) | |
| Appellants-Plaintiffs, | ) ) | |
| vs. | ) ) | No. 79A04-1202-CT-61 |
| CHRISTINE HUCK, LAURA ZIMMERMAN, ANGELA SMITH GROSSMAN, RHONDA FRIEND, ANGYL McCLAINE, and INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) ) ) | |
| Appellees-Defendants. | ) ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas J. Busch, Judge
Cause No. 79D02-1103-CT-11

October 17, 2012

**OPINION - FOR PUBLICATION**

**ROBB, Chief Judge**

D.L., Glen Black, Ann Black, Steven Lucas, and K.L. (collectively, the "Family") appeal the trial court's dismissal of seven out of eight counts of their complaint against the Tippecanoe County Department of Child Services and five of its employees (collectively, "DCS"). The Family raises two restated issues on appeal: 1) whether DCS was entitled to quasi-judicial immunity as granted by the trial court; and 2) whether Glen, Ann, and Steven had standing to assert claims against DCS. Concluding that DCS was not entitled to quasi-judicial immunity, but is entitled to statutory immunity as to all but one of the seven dismissed claims, and that Glen and Ann had standing to bring suit but Steven did not, we remand.

## Facts and Procedural History

K.L. was born on March 11, 2008, to her mother, T.L, and father, D.L. The parents were married at the time but not living together, in part because D.L's job as an airline contractor required frequent relocations. Based on T.L.'s history, DCS removed K.L. from T.L's care two days after K.L.'s birth. A child in need of services ("CHINS") action was filed and K.L. was determined to be a CHINS.

Because of the CHINS proceeding, D.L. returned to Indiana and began participating in weekly supervised visits with K.L. Believing that he could not care for K.L. because of the demands of his job, D.L. turned to his sister, Ann Black, and her husband, Glen Black (the "Blacks"). The Blacks sought to obtain custody of K.L. Prior to placing K.L. with the Blacks, DCS completed a home study and comprehensive background check of the Blacks. DCS noted that criminal history checks and a search of

2

the Indiana Sex Offender Registry revealed no prior charges or allegations against either of the Blacks, and that further there were no prior charges or complaints against either of them in DCS records. Concluding that the Black's home was appropriate for K.L. and would provide a safe and stable environment, on June 25, 2008, DCS placed K.L. with the Blacks. Following K.L.'s placement with the Blacks, D.L. continued his weekly supervised visits.

In November of 2008, D.L. had a conversation with DCS in which they discussed the possibility of the Blacks adopting K.L. During that conversation, D.L. was told that if he consented to the adoption and voluntarily terminated his parental rights, he would not have to participate in services and could visit K.L. at will. Based on that conversation, and believing that the Blacks could provide a better home for K.L., D.L. stopped participating in services and instead began visiting K.L. almost daily in the Blacks' home.

By February 2009, DCS's plan for K.L. had changed from reunification to adoption. Both T.L. and D.L. filed voluntary petitions to terminate their parental rights, explaining that they thought adoption by the Blacks was in K.L.'s best interest and that the Blacks had taken good care of her. Immediately prior to the termination hearing, counsel for DCS confirmed with D.L. that the Blacks would be able to adopt K.L. unless they were "hit by a bus or something like that." Appellants' Brief at 4. At the end of the hearing, the court ordered the termination of the parental rights of both D.L. and T.L. and authorized the immediate filing of a petition to adopt K.L. by the Blacks.

The following month, DCS appeared at the Blacks' home unannounced and removed K.L. from the Blacks' custody. DCS did not have a court order to remove K.L.

3

The removal was based on a twenty-year-old child abuse report against Glen that DCS had recently found, in which Glen's then sixteen-year-old daughter accused him of sexually abusing her when she was eight to ten years old. The report was "substantiated" based solely on the daughter's statement when it was made in 1998. When the report was made, DCS did not perform a comprehensive investigation, did not interview Glen or Ann or any of the children residing with Glen, and did not provide a copy of the report to the Blacks. The allegation was never the subject of a CHINS action or any criminal charges. The Blacks were unaware that there had been a substantiated allegation against Glen until DCS appeared and removed K.L. from their home.

After K.L.'s removal, DCS denied the Blacks any opportunity to address the allegation to challenge K.L.'s removal. DCS withdrew its consent to the Blacks' adoption petition, and prohibited the Family from having any contact with K.L. D.L. sought custody, but was denied based on the termination of his parental rights. Steven also sought and was denied custody.[1] K.L. was placed in the home of a couple who had no previous relationship with K.L. but were personal friends of the regional director of the Indiana Department of Child Services.

D.L. endeavored to have the order terminating his parental rights set aside, and DCS opposed these efforts. The trial court denied D.L.'s motion, but this court reversed, finding that DCS "may have put form over substance and failed to do what was in the best interest of K.L." In re K.L., 922 N.E.2d 102, 108 (Ind. Ct. App. 2010). After the

---

[1] There seems to be some dispute between the parties as to whether Steven formally requested custody of K.L., and whether DCS ever considered placing K.L. with him.

4

appeal, D.L. was allowed to resume contact with K.L. In August of 2010, K.L. was returned to D.L.'s custody.

The Family brought suit against DCS, asserting multiple claims including negligence, fraud, intentional infliction of emotional distress, and violations of due process rights. DCS filed a motion to dismiss and the trial court granted dismissal of seven of the eight counts, holding that the claims were barred by quasi-judicial immunity because they were based on allegations that DCS acted wrongly in the course of duties within the CHINS proceeding for K.L. The trial court also concluded that Ann, Glen, and Steven lacked standing to bring the claims against DCS because they did not have a custodial relationship with K.L. prior to the CHINS proceeding. The court allowed one claim to go forward, in which Glen claimed negligence on the part of DCS regarding the substantiated report. The Family now appeals the dismissal of their other seven claims.

## Discussion and Decision[2]

### I. Standard of Review

In reviewing a motion to dismiss granted pursuant to Indiana Trial Rule 12(B)(6), our standard of review is well settled: a Trial Rule 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim, not the facts supporting it. Town of Plainfield v. Town of Avon, 757 N.E.2d 705, 710 (Ind. Ct. App. 2001), trans. denied. Therefore, we view the complaint in the light most favorable to the non-moving party, drawing every reasonable inference in favor of this

---

[2] We heard oral argument on September 27, 2012, at Indiana State University in Terre Haute, Indiana. We thank the students, faculty, and staff of the university for the gracious reception, and counsel for their presentations.

5

party.  Id.  In reviewing a ruling on a motion to dismiss, we stand in the shoes of the trial court and must determine whether the trial court erred in its application of the law.  Id. The trial court's grant of the motion to dismiss is proper if it is apparent that the facts alleged in the complaint are incapable of supporting relief under any set of circumstances. Id.  Furthermore, in determining whether any facts will support the claim, we look only to the complaint and may not resort to any other evidence in the record.  Id.

## II.  Quasi-Judicial Immunity

It is well-settled that judges are entitled to absolute judicial immunity from suits for money damages for all actions taken in the judge's judicial capacity, unless those actions are taken in the complete absence of any jurisdiction.  H.B. v. State of Indiana-Elkhart Div. of Family & Children, 713 N.E.2d 300, 302 (Ind. Ct. App. 1999), trans. denied.  The underlying purpose of the immunity is to preserve judicial independence in the decision-making process.  Id.  That same underlying policy justifies granting immunity to non-judicial officers who perform quasi-judicial functions.  Id.  This quasi-judicial immunity is given to people "performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune."  Id.  Courts are, however, reluctant to apply quasi-judicial immunity too broadly, and if the "acts do not involve the judicial process so that a fear exists that freedom of judicial decision-making may be stifled," then the person or act in question should not be shielded by immunity.  Lake Cnty. Juvenile Court v. Swanson, 671 N.E.2d 429, 435 (Ind. Ct. App. 1996), trans. denied.

To determine which acts are covered by quasi-judicial immunity, the United States Supreme Court has adopted a functional approach, where the court looks to the nature of the function performed rather than the identity of the actor who performed it. H.B.,713 N.E.2d at 302 (citing Forrester v. White, 484 U.S. 219, 224 (1988)). Under this approach, even judges are not immune for acts that stem from functions that are not adjudicative. Forrester, 484 U.S. at 219. Thus the "touchstone" when applying the functional approach is "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36 (1993).

The question here then is which, if any, of the actions underlying the Family's complaint were so integral to or intertwined with the judicial process that, in performing them, DCS would be considered an arm of the court and thus immune.

The Family notes that there are two overarching scenarios in which the functional approach leads to a grant of immunity. The first scenario is one in which there is a direct adjudication of rights, either by a judge or by someone performing an action that is functionally equivalent to that of a judge. Snyder v. Nolen, 380 F.3d 279, 286 (7th Cir. 2004). The second scenario involves individuals who are carrying out the explicit orders of a judicial officer. Id. at 287. The Family contends that neither scenario is applicable to the facts of the current case, and DCS does not argue that it was acting under the first. The Family argues that the actions here do not fit within the second type of scenario either. The Family argues that the investigation into the Blacks' backgrounds and the discovery of the substantiated report occurred "in the absence of court direction, or even

7

approval." Appellants' Br. at 11. The removal itself was done without a court order. And following removal of K.L. from the Blacks, DCS failed to involve the court or seek approval retrospectively.

DCS argues that the actions here do fit within the second scenario as described in Snyder, and that DCS should therefore be given immunity. DCS relies largely on the fact that K.L. was the subject of a CHINS proceeding at the time of the events underlying the Family's claims, and also relies on the H.B. case. In H.B., children were removed from their mother's home and placed in foster care. During a visit with their mother, one of the children was allegedly molested by the mother's boyfriend. The incident was reported to the Division of Family and Children ("DFC") but not law enforcement. DFC later recommended that the children be reunited with their mother, and following that reunification the boyfriend molested at least two of the children. H.B., 713 N.E.2d at 301. In that case, we held that the DFC was entitled to immunity because it was acting in accordance with a court order to monitor the progress of the children, the reunification recommendation was made during a judicial proceeding, and the failure to report to law enforcement occurred in the course of court-ordered duties after the children were adjudicated CHINS. Id. at 303. DFC was thus determined to be immune because the actions they took were closely related to the judicial process.

DCS also points us to J.A.W. v. State, 650 N.E.2d 1142 (Ind. Ct. App. 1995), in which we held that a probation officer was entitled to quasi-judicial immunity for activities that were necessary for the enforcement of the court's order. The activities included meeting with the child, investigating complaints, reporting the results of

8

investigations to the court, and making recommendations regarding continued placement. However, J.A.W. was vacated when the Indiana Supreme Court granted transfer; the supreme court case did not address quasi-judicial immunity. See J.A.W. v. State, 687 N.E.2d 1202 (Ind. 1997). We agree with the Family that the current case is distinguishable both from H.B. and J.A.W. In those cases, the defendants were performing tasks assigned by the court in order to assist the court in decision making. Their actions and recommendations were subject to court review and supervision. Here, the actions taken by DCS are not nearly as closely tied to a judicial proceeding. After D.L and T.L's parental rights were terminated and adoption by the Blacks was pending, while DCS might be expected to sign off on the final adoption, they would no longer be expected to work closely with the court as they had while sorting out the CHINS case. DCS was not acting directly at the instruction of a court, and they failed to seek a court order for K.L's removal either before or immediately after they removed her. No court reviewed their removal of K.L. or any of their subsequent actions or decisions.

Further, the Family persuasively argues that an approach granting immunity to all CHINS-related matters would amount to, not quasi-judicial immunity, but complete and total immunity for all of its actions and would be contrary to the functional analysis required by Forrester, and that under such a broad approach, DCS would "have immunity for every action it took regarding every child or family involved in a CHINS action." Appellants' Reply Brief at 6. The Family advocates a more nuanced analysis in keeping with the functional approach, and directs us to Millspaugh v. Cnty. Dept. of Pub. Welfare of Wabash Cnty., 937 F.2d 1172, 1175 (7th Cir. 1991), cert. denied, 502 U.S. 1004

9

(1991), a Seventh Circuit case that is relevant to the case at hand as a CHINS proceeding was the subject of that case as well, and is helpful because the court dissected the various actions underlying the complaint to determine which qualified for immunity.

In Millspaugh, mothers brought suit against the department of public welfare after one of its social workers initiated and was involved in a CHINS proceeding involving the mothers' children. Id. at 1175. The court determined that the social worker had immunity for her behavior in court, including the materials that she chose to provide or withhold from the court, her requests for the court to make certain decisions, her motives for pursuing the case, and her failure to communicate with the mothers. Id. For all of these actions, the court held that what the worker did could not harm the mothers unless the court agreed. However, the worker was not given absolute immunity for the application for the initial order, which was likened to a police officer's affidavit for a search warrant, or for her seizure of the children, which was deemed analogous to seizing evidence under a warrant and would have injured the mothers "even had the state court resolved all questions in their favor." Id. at 1176-77. Because in the case at hand DCS was not actively engaged with the court, and the child was seized without a court order, the facts more closely fit the types of actions for which the Millspaugh court determined that immunity was not appropriate. Here, the family was harmed without a court agreeing to any of the harmful actions.

All of the actions complained of by the Family were only indirectly, at best, related to any court order or instruction, and were not sufficiently intertwined with the judicial process to qualify for quasi-judicial immunity. DCS's handling of this case was

10

extremely sloppy, careless, and regrettable. Based on a twenty-year-old report and with no investigation, they independently decided to remove K.L. from the Blacks' home. Because there was no court oversight of DCS's actions and decisions, and they were not implementing a court order, DCS is not entitled to quasi-judicial immunity for any of the actions underlying the Family's complaint. DCS may not choose to side-step the judicial process and then hide behind that same process.

### III. Statutory Immunity

However, while the trial court dismissed the seven counts based on quasi-judicial immunity, DCS in its motion to dismiss outlined other immunities that it believed were applicable. Because we may affirm on any ground, we will address DCS's claim of statutory immunity under Indiana Code section 31-25-2-2.5. City of South Bend v. Century Indem. Co., 821 N.E.2d 5, 9 (Ind. Ct. App. 2005) ("We may sustain the trial court's ruling if we can affirm on any basis found in the record."), trans. denied. The statute provides, regarding the Department of Child Services, that "[t]he following are not personally liable, except to the state, for an official act done or omitted in connection with performance of duties under this title: (1) The director of the department. (2) Other officers and employees of the department." Ind. Code § 31-25-2-2.5. There is no published case law interpreting this statute, but in interpreting a statute our goal is to give effect to the intent of the legislature, and in doing so we are guided by the principle that the best evidence of the legislature's intent is the language of the statute itself. Robinson v. Gazvoda, 783 N.E.2d 1245, 1250 (Ind. Ct. App. 2003), trans. denied.

11

This statute grants an immunity that is broader than that of quasi-judicial immunity, in that it specifically encompasses both actions and omissions, and does not apply only to actions taken in conjunction with a court. While the doctrine of quasi-judicial immunity is limited and does not apply to the facts at hand, the statute granting immunity does appear to apply to most of the actions that underlie the Family's claims. Most of the Family's claims are for harms that occurred as the result of actions or omissions that could reasonably be seen to be within the duties of the Department of Child Services employees. The fraud claim, however, is based on alleged acts that would not be within the duties of the Department, and therefore would not be protected by immunity. Further, although the statute applies only to employees of the Department of Child Services and not the organization itself, the only way to reach the organization is through the doctrine of respondeat superior; thus once the employees here are given immunity, DCS as a whole effectively has immunity for those actions and omissions.[3] We are constrained by the plain language of the statute to hold that DCS is entitled to statutory immunity for all of the dismissed claims with the exception of the claim for fraud, which will be allowed to move forward.

---

[3] In Columbus Reg'l Hosp. v. Amburgey, 2012 WL 4097716 at *6, No. 03A01-1110-CT-450 (Ind. Ct. App. Sept. 19, 2012), we recently allowed a complaint against a hospital to go forward under a theory of vicarious liability where suit against the physicians whose acts were at issue was barred by a statute of limitations. That case is distinguishable from the case at hand. In Amburgey, while the physicians were not originally named, suit against them was possible when suit was timely brought against the hospital; it was only later that the statute of limitations ran. Here however, because of statutory immunity, suit against the individual employees would never have been possible.

IV. Standing

The second issue on appeal stems from the trial court's determination that Ann, Glen, and Steven did not have standing to raise any of the claims that were dismissed. Standing refers to the question of whether a party has an actual demonstrable injury for purposes of a lawsuit. Smith v. City of Hammond, 848 N.E.2d 333, 339 (Ind. Ct. App. 2006), trans. denied. To establish standing, a plaintiff must demonstrate a personal stake in the outcome of the lawsuit and that the injury is a result of the defendant's conduct. Id. at 339-40. A determination that Ann, Glen, or Steven had standing would necessarily be based on a determination that they had a protectable liberty interest in their family unit with K.L., or as the Family puts it, "in their ongoing relationship with K.L." Appellants' Br. at 15; see Smith v. Org. of Foster Families For Equal. & Reform, 431 U.S. 816, 840-43 (1977).

We are unable to find, and the parties do not point to, Indiana cases on point that provide guidance as to the liberty interests that may reside with the extended family members in this case. Nonetheless, the Family makes a convincing argument for finding a liberty interest in the Blacks. Indiana law itself recognizes the importance of blood relationships, and requires child services to consider suitable blood relatives for placement of the child before looking to other out-of-home placements. Ind. Code § 31-34-15-4(3). In Smith, the United States Supreme Court noted that the importance of family relationships stems from maintaining emotional attachments, promoting a way of life to children, and preserving blood ties. Id. at 844. Recognizing that strong bonds can form in the absence of blood relationships, the Court was unable to dismiss a typical

13

foster family as "a mere collection of unrelated individuals," and noted that in the right circumstances, a foster family may "hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family."  Id.

The Court ultimately avoided reaching the issue of whether the foster parents had a liberty interest, but in its analysis the Court distinguished a typical foster family from a natural family, identifying differences that, as the Family points out, are absent in the case at hand.  Firstly, in a typical foster family situation, the source of the family is in state law and contract, rather than having origins outside the State.  Id. at 845.  Here, while there was an additional relationship between K.L. and the Blacks that was provided by the State, the Blacks had a pre-existing biological relationship with her that was unrelated to any contract and that is not typical of foster families.

Secondly, and perhaps most importantly, in a typical foster parent situation there will be an unavoidable tension between any liberty interests of the foster parents and those of the natural parents.  Id. at 846.  "Whatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents."  Id. at 846-47.  Here, there was no such tension.  K.L.'s natural parents wanted the Blacks to raise her, and in fact terminated their parental rights in expectation of the Blacks adopting K.L.  The Blacks' goals and the natural parents' goals were in harmony.  Given that lack of tension, in addition to the multiple ties that the Blacks had to K.L.—they are her blood relatives, they were her foster parents, they were in the process of adopting her,

14

and they had raised her practically since birth—it seems at odds with reality to conclude that they did not have any liberty interest in their relationship with her.

Other courts have also found a liberty interest in foster parents who had stronger ties to the child than does a typical foster parent. See, e.g., Rivera v. Marcus, 696 F.2d 1016, 1024-25 (2d Cir. 1982) (finding a liberty interest in a custodial relative who was also a foster parent); Osborne v. Cnty. of Riverside, 385 F. Supp. 2d 1048, 1053-55 (C.D. Cal. 2005) (finding that a grandmother and an aunt would both have a liberty interest in family integrity where they had a long-standing custodial relationship with related children); A.C. v. Mattingly, 2007 WL 894268 at *5, No. 05 CV 2986 (TPG), (S.D.N.Y. Mar. 20, 2007) (finding a liberty interest where the foster mother was a biological relative who had raised the children essentially from birth, and there was no indication of objection from the natural parents); see also Berhow v. Crow, 423 So. 2d 371, 372 (Fla. Dist. Ct. App. 1982) (holding that foster parents, selected by the mother and approved of by the father permanently to care for their infant, have a liberty interest); cf. Kyees v. Cnty. Dept. of Pub. Welfare of Tippecanoe Cnty., 600 F.2d (7th Cir. 1979) (holding that there was no liberty interest for the typical foster parents in question).

The Rivera court also noted that the children in question themselves held a liberty interest in preserving the integrity and stability of their extended family, where they were not being removed in order to be reunited with their natural parents, and that the court "must ensure that due process is afforded in situations like that presented here where the state seeks to terminate a child's long-standing familial relationship." 696 F.2d at 1026. Additionally, some courts have found prospective adoptive parents to have protected

15

liberty interests in their family unit. Thelen v. Catholic Soc. Serv., 691 F. Supp. 1179, 1185 (E.D. Wis. 1988). But see Rodriguez v. McLoughlin, 214 F.3d 328, 341 (2d Cir. 2000) (holding that there was no liberty interest, where adoption placement agreement made it clear that adoption was not a foregone conclusion), cert. denied, 532 U.S. 1051 (2001).

Under the facts of the case before us, we determine that the Blacks had a liberty interest in their relationship with K.L., such that they had standing to bring suit. The argument that Steven has a liberty interest in his relationship with K.L. is much more tenuous however. The Family largely argues that Steven is "more than 'just a grandfather'" because of the Indiana law calling for child services to consider suitable blood relatives, including grandparents, before considering out of home placements. Appellant's Br. at 22-23; Ind. Code § 31-34-15-4(3). The Family points to, and independent research has revealed no, cases that support the proposition that grandparents, without a custodial relationship, have a liberty interest in the relationship with their grandchildren. While blood ties may be an important consideration, they are not, standing alone, sufficient to confer a protectable liberty interest. Much of the law surrounding grandparents' rights with regards to their grandchildren is related to the grandparent visitation statute in Indiana, which is in derogation of the common law. In re Visitation of J.P.H., 709 N.E.2d 44, 46-47 (Ind. Ct. App. 1999). If at common law grandparents have no right to seek visitation with a grandchild, it follows that they do not have a liberty interest in maintaining a relationship with that child, at least absent a

custodial relationship as in the cases noted above.  The trial court correctly determined that Steven did not have standing to bring suit.

## Conclusion

We conclude that DCS was not entitled to quasi-judicial immunity for any of the claimed actions but is entitled to statutory immunity for all of the dismissed claims except for the fraud claim.  We further conclude that Ann and Glen, but not Steven, had standing to bring suit.  Therefore, D.L., K.L., Ann Black, and Glen Black may proceed on the fraud claim.  Remanded for proceedings consistent with this opinion.

Remanded.

BRADFORD, J., and PYLE, J., concur.