**In the Matter of the Termination of the Parent–Child Relationship of K.L.,**

**D.L., Appellant–Respondent,**

v.

**Tippecanoe County Department of Child Services, Appellee–Petitioner.**

**No. 79A04–0908–JV–482.**

Court of Appeals of Indiana.

March 3, 2010.

---

Melanie K. Reichert, Broyles Kight & Ricafort, P.C., Indianapolis, IN, Attorney for Appellant.

Craig Jones, Lafayette, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

D.L. (Father) appeals from the trial court's refusal to set aside the judgment terminating his parental rights. Father presents three issues for review, which we consolidate and restate as: Did the trial court abuse its discretion in refusing to set aside the judgment terminating Father's parental rights?

We reverse and remand.

T.W. (Mother) and Father are the parents of K.L., born March 11, 2008. Prior to K.L.'s birth, the Fountain County Department of Child Services (FCDCS) removed Mother's two older children from her care due to allegations of neglect. During her pregnancy with K.L., Mother abused alcohol and marijuana. Mother also cut herself and was hospitalized for cutting when she was seven months pregnant with K.L. Because of Mother's history relating to her two older children and her substance abuse and psychological issues during her pregnancy, the FCDCS removed K.L. from Mother's care on March 13, 2008, prior to Mother and K.L.'s release from the hospital following K.L.'s birth. The Fountain County court that heard the allegations that K.L. was a child in need of services (CHINS) determined that appropriate venue rested with Tippecanoe County. A CHINS action was filed in that county under Cause No. 79D03–0803–JC–78, and K.L. was determined to be a CHINS.

At the time of K.L.'s birth, Mother and Father were married but not living together. Father lived and worked in Florida. Father's employment as a contractor for U.S. Airlines required non-traditional and inconsistent working hours and frequent relocations. He did not return to Indiana for K.L.'s birth. Unlike Mother, Father has no history with drugs, no criminal history, and no prior allegations of child abuse or neglect. Because of the CHINS proceedings concerning K.L., Father returned to Indiana and began participating in weekly supervised visits with K.L. The supervised visits went well and no problems were reported. In fact, it was noted that Father was appropriate with K.L.

On June 25, 2008, the Tippecanoe County Department of Child Services (TCDCS) placed K.L. in the care of Father's sister, Ann, and her husband, Glen. Prior to placement, the TCDCS, by its Family Case Manager (FCM), Christie Huck, completed a home study of Ann and Glen's home and comprehensive background checks (including criminal) of both Ann and Glen. FCM Huck noted in her report that Ann and Glen were married on November 8, 1997. Glen has two grown daughters from a previous marriage with whom he has regular contact and Ann has two daughters from a previous marriage that live in the home. Ann and Glen have a nine-year-old daughter together. FCM Huck further noted that criminal history checks and a search of the Indiana Sex Offender Registry revealed no prior charges or allegations against Ann or Glen. FCM Huck further represented that she had searched DCS records and that there were no prior charges or complaints against Ann or Glen.

FCM Huck concluded that Ann and Glen's home was appropriate for K.L. and that Ann and Glen were capable of providing a safe and stable environment for K.L.

After K.L.'s placement with Ann and Glen, Father continued his supervised, weekly visitations with K.L. In the fall of 2008, Father had a conversation with FCM Huck during which they discussed Father's options and the possibility of Ann and Glen adopting K.L. At no point during the conversation was the possibility of K.L. being adopted by someone other than Ann and Glen discussed. FCM Huck explained to Father that he would not have to participate in services if he agreed to voluntarily terminate his parental rights, thus paving the way for Ann and Glen to adopt K.L.[1] FCM Huck also informed Father that adoption by Ann and Glen was not guaranteed because Mother was still working toward reunification with K.L. Mother eventually agreed to voluntarily terminate her parental rights, accepting the permanency plan in place for K.L., that being adoption of K.L. by Ann and Glen. Father, believing adoption by Ann and Glen to be in K.L.'s best interest, likewise agreed to voluntarily terminate his parental rights and thereafter stopped participating in the supervised, weekly visitations with K.L. After Father stopped participating in services offered by the TCDCS, Father continued to have contact with K.L. In fact, Father's contact with K.L. became more frequent as he would visit with K.L. almost every evening at his sister's home, whereas he was able to have only one supervised visit with K.L. each

---

1. FCM Huck references this discussion with Father in her report dated November 10, 2008. FCM Huck further noted in her report that aside from his weekly visits with K.L., Father had not yet completed other services such as participating in a mental health screen, completing CA/RE Group, or maintaining bi-weekly contact with her. FCM Huck further noted, however, that Father maintained employment and there were no issues concerning drug or alcohol abuse on the part of Father.

week as part of the TCDCS's offered services.

At a permanency hearing on February 6, 2009, Father and Mother both requested the TCDCS file voluntary petitions to terminate their parental rights. After the TCDCS filed such petitions, the court immediately moved to a hearing thereon. Mother was represented by counsel during the hearing, but Father elected to proceed without counsel. Father was advised in writing of his right to counsel and twice more during the hearing, once by the court and once by counsel for the TCDCS. The court repeatedly expressed its reluctance to allow Father to proceed with the termination hearing without counsel, even offering to delay the proceedings to find counsel within the courthouse with whom Father could consult. Father declined the court's offer and repeatedly indicated that he did not desire counsel. The court continued with the hearing. During the hearing, all parties identified the permanency plan for K.L. as adoption by Ann and Glen and indicated their support therefore. It was based on this permanency plan that Father and Mother executed their voluntary consents to termination of their parental rights. Mother explained that adoption by Ann and Glen was in K.L.'s best interest as K.L. had been in their home since soon after her birth and she had been well taken care of. Father likewise explained that, while he desired to remain a part of K.L.'s life, he believed adoption by Ann and Glen was in K.L.'s best interest because they could offer her more stability.

During the hearing, Father was told and Mother was told in Father's presence that the decision to voluntarily terminate was irreversible. The court asked Father relevant questions about his mental state, education, and possible intoxication or dis-

abilities before deciding that Father was capable of rendering valid consent to termination. The court also verified with Father that he had read the documents presented to and signed by him regarding the termination of his parental rights, that Father had sufficient time to contemplate his decision, and that Father had the opportunity to consult with people he trusted before executing his consent to voluntary termination. Father responded that he had been contemplating his decision for three months (since his initial conversation with FCM Huck) and that he had time to consult with an attorney if he had wished. Father was also asked about his reasons for terminating his rights. Father acknowledged that the TCDCS had offered him all of the tools and services necessary to gain custody of K.L., but explained, "I'm not stable enough to take care of [K.L.].... I don't know how long it will be until I get to where I need to be that way." *Appendix* at 76. The court also asked Father:

> And I know that we are very hopeful and all expect that [K.L.'s] present placement would become her adoptive home, but do you feel comfortable that even if something should for whatever reason go wrong there that she is a child who could readily be adopted into a good, safe home?

*Transcript* at 75. Father responded, "Yes." *Id.*

At the end of the hearing, the court ordered that Father's and Mother's parental rights be terminated.[2] At the request of the TCDCS, the trial court also authorized Ann and Glen to immediately move forward with filing and finalizing the adoption of K.L. rather than waiting another sixty days for a review hearing. The court's written order terminating Father's

---

2. Mother is not a party to this appeal.

and Mother's parental rights was entered on February 16, 2009. On March 27, 2009, the TCDCS, without notice, removed K.L. from Ann and Glen's home and withdrew its consent to their adoption of K.L. The TCDCS showed Ann a report that was made in April 1998 after one of Glen's daughters made a statement that Glen had sexually abused her when she was eight to ten years old. At the time the report was made, Glen's daughter was sixteen years of age. When the report was made, the DCS did not interview Glen or Ann or any of the children who resided with Glen. The allegation was never the subject of a CHINS action nor were criminal charges ever filed. The alleged abuse was considered "substantiated" in 1998 based solely upon Glen's daughter's statement.[3] *Father's Exhibit 1.*

On April 13, 2009, Father, by counsel, sought to set aside the judgment terminating his parental rights. The trial court held a hearing on Father's motion on June 5, 2008. At the hearing, counsel for the DCS stipulated that the TCDCS had "institutional knowledge" of the prior substantiated abuse allegation against Glen and admitted that FCM Huck had made a mistake when she completed the initial home study and indicated that there were no records in the DCS system concerning Glen. *Transcript* at 43. Father argued that based on the representations made by the TCDCS, i.e., that there were no DCS records against Glen and that the DCS supported Ann and Glen's adoption of K.L., he had no reason to suspect that the permanency plan in place for K.L. would not go through absent a drastic event such as Ann's and Glen's death. Father maintained that he never contemplated someone other than his sister adopting K.L. and that if he had known that was a real possibility, he would not have voluntarily

terminated his rights and would have continued with services. At the conclusion of the hearing, the court took the matter under advisement. By written order dated July 23, 2009, the trial court refused to set aside the judgment terminating Father's parental rights. Father now appeals.

■ In seeking to set aside the judgment terminating his parental rights, Father is essentially trying to withdraw his consent thereto. A parent's ability to withdraw consent to the termination of his or her parental rights is "extremely limited." *Youngblood v. Jefferson County Div. of Family & Children,* 838 N.E.2d 1164, 1169 (Ind.Ct.App.2005), *trans. denied.* Indeed, we have held that "[a] parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors." *In re M.R.,* 728 N.E.2d 204, 209 (Ind.Ct. App.2000), *trans. denied; see also* Ind. Code Ann. § 31-35-1-12 (West, Westlaw through 2009 1st Special Sess.).

Father seeks to set aside the judgment terminating his parental rights on three separate grounds. First, Father argues that the judgment should be set aside based upon FCM Huck's mistake/misrepresentation in her home study report that DCS records contained no reports or charges against Glen. In a related argument, Father asserts that the judgment should be set aside because it was procured by fraud or constructive fraud, again, basing his argument on FCM Huck's mistake/misrepresentation in the home study report that there were no charges in the DCS system that raised any red flags. As applicable to both arguments, Father asserts that FCM Huck's

---

**3.** Neither Glen nor Ann knew of the "substantiated" report. *Father's Exhibit 1.*

mistake/misrepresentation in her home study report was a crucial factor underlying the TCDCS's support for the adoption of K.L. by Ann and Glen and his decision to voluntarily consent to termination of his parental rights to pave the way for such adoption. Finally, Father argues public policy regarding parents' rights to establish a home and raise their children weighed in favor of setting aside the judgment terminating his parental rights. *See In re H.T.*, 911 N.E.2d 577 (Ind.Ct.App. 2008). Given the unique facts of this case, we find Father's third argument to be persuasive.

▮ Here, early indications were that Father was developing a relationship with K.L., visiting with her on a weekly basis, and there are no reports that the TCDCS was concerned with Father's involvement in K.L.'s life. Father, however, believed that his employment as a contractor, which required non-traditional and inconsistent working hours and frequent relocations, did not provide a stable environment to raise K.L. Father believed that K.L. was flourishing in the care of his sister, a stay-at-home mom and mother of three girls, and her husband. The record confirms Father's belief that K.L. was thriving in Ann and Glen's care. CASA noted in his report that Ann and Glen had provided K.L. with a "loving home" and that K.L. was "surrounded by a family that absolutely adores her. CASA feel's [sic] [K.L.] is treasured by all the members [of Ann and Glen's] family." *Appellant's Appendix* at 46. CASA concluded that K.L.'s placement with Ann and Glenn was "wonderful" and that K.L. was "benefitting from the best possible placement." *Id.* at 48.

In the fall of 2008, Father approached FCM Huck to discuss his options. FCM Huck informed Father that the TCDCS would approve of adoption of K.L. by Ann and Glen, but noted that such adoption was not guaranteed as Mother was still seeking reunification with K.L. Mother eventually agreed that adoption of K.L. by Ann and Glen was in K.L.'s best interest and therefore, Mother requested voluntary termination of her parental rights. Father, believing adoption by Ann and Glen to be in K.L.'s best interest because of the stability they could provide, decided to follow FCM Huck's advice to disengage from services and to consent to voluntary termination of his parental rights. Father maintains that his decision was premised entirely upon the TCDCS's representation that Ann and Glen were suitable adoptive parents and that the TCDCS approved of their adoption of K.L., which in turn was based on the mistake/misrepresentation of FCM Huck in her home study report. Father's decision was also influenced by the fact that he would remain a part of K.L.'s life.

The record clearly demonstrates that Father's decision to voluntarily terminate his parental rights was not based upon a desire to exit K.L.'s life. To the contrary, after ceasing visitation through the TCDCS, Father spent more time with K.L., visiting with her most evenings at his sister's home. Father continued to develop a relationship with K.L. We also note there is nothing in the record that suggests the TCDCS was concerned about Father's involvement in K.L.'s life. Father had shown himself to be appropriate with K.L., was employed, and had no problems with alcohol or drug abuse. Indeed, at all times during the proceedings, the TCDCS believed adoption by Ann and Glen to be in K.L.'s best interest, while at the same time it supported Father's involvement in K.L.'s life.

The genuine understanding of all parties was that Ann and Glen would adopt K.L. This permanency plan was expressly communicated to the trial court and reiterated

by all parties involved. Father admits that he was told the adoption by Ann and Glen was not guaranteed, but asserts that he was informed that it would not come to pass only if something drastic happened, the example being given of Ann and Glen being killed in a car accident. The TCDCS also expressed its strong belief that nothing short of a catastrophic event would prevent K.L.'s adoption by Ann and Glen from going through. At the conclusion of the hearing, counsel for the TCDCS requested that the court forgo a sixty-day review period and immediately approve the filing and finalizing of the adoption, which the court did. At all times, all parties proceeded under the assumption that Ann and Glen would adopt K.L. and believed that such action was in K.L.'s best interest. It is undisputed that all parties labored under the misrepresentation made in the home study report that there were no DCS records against Ann or Glen that would prevent K.L.'s placement in their home or their subsequent adoption of K.L. As acknowledged several times by the TCDCS, such misrepresentation was a mistake made by FCM Huck, the case manager who conducted the initial home study.

As soon as the "substantiated" abuse report against Glen was discovered, the TCDCS moved swiftly in removing K.L. from Ann and Glen's home and withdrew its approval of the adoption. Father quickly retained an attorney and moved to set aside the judgment terminating his parental rights. In light of the discovery and the prompt action taken based solely on the "substantiated" report from nearly eleven years prior (about an alleged incident nearly twenty years prior), the TCDCS may have put form over substance and failed to do what was in the best interest of K.L. The TCDCS has never expressed an opinion that K.L.'s best interest would be served by severing all ties with Father or that Father was incapable of being a proper parent for K.L.

We find it telling that counsel for the TCDCS did not want to limit Father in his presentation of evidence during the hearing on his motion to set aside the judgment terminating his parental rights. Counsel for the TCDCS acknowledged that the situation was "too interesting already," acknowledging the peculiar circumstances of this case. *Transcript* at 9. The TCDCS repeatedly acknowledged that the prior substantiated report against Glen was within DCS records and that DCS had institutional knowledge of the report at the time FCM Huck issued her home study report prior to K.L.'s placement in Ann and Glen's home. The TCDCS further acknowledged that FCM Huck made a mistake when she misrepresented in her report that there were no DCS records for Glen. Moreover, the TCDCS does not dispute that all parties moved forward with the genuine understanding that the permanency plan for K.L., i.e., adoption by Ann and Glen, would be carried out. The representations made by the TCDCS regarding its future intent was consistent with Father's expectations and desires and too were based on the misrepresentations set forth in FCM Huck's home study report.

It is true that Father was appropriately advised of his constitutional and legal rights and that the trial court carefully questioned Father about his consent to voluntarily terminate his parental rights. It remains, however, that all advisements and questions were clouded by the misrepresentation contained in the home study report and the TCDCS's subsequent actions that served as the basis for K.L.'s placement with Ann and Glen and the TCDCS approval of the permanency plan calling for K.L.'s adoption by Ann and Glen. Father was not the only party mov-

ing forward in K.L.'s best interest in reliance upon the misrepresentation made by an employee of the TCDCS. It seems safe to say that had FCM Huck adequately searched the DCS records, K.L. never would have been placed in Ann and Glen's home and the possibility of adoption of K.L. by Ann and Glen would not have been the deciding factor in Father's decision to terminate his parental rights. Under these circumstances, we find that Father's consent to voluntarily terminate his parental rights was vitiated by the misrepresentations made by the TCDCS through FCM Huck. Therefore, the petition to set aside the judgment terminating his parental rights should have been granted.

Judgment reversed and remanded.

NAJAM, J., and BRADFORD, J., concur.