**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 05 2013, 9:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW S. WILLIAMS**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES:

**DIANNA L. MEJIA**
Indiana Department of Child Services
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: M.A.P. (Minor Child), | ) ) ) ) | |
| and | ) ) | |
| M.L.P. (Father) | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 02A03-1206-JT-254 |
| INDIANA DEPARTMENT OF CHILD SERVICES, ALLEN COUNTY OFFICE | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT, FAMILY RELATIONS DIVISION
The Honorable Charles F. Pratt, Judge
Cause No. 02D07-0802-JT-66

**February 5, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

M.L.P. (Father) challenges the termination of his parent-child relationship with M.A.P. More particularly, Father claims that the Indiana Department of Child Services (the DCS) failed to present clear and convincing evidence that the reasons M.A.P. was placed outside of Father's home would not be remedied or that the continuation of the parent-child relationship posed a threat to M.A.P., that termination was in M.A.P.'s best interests, or that adoption was a satisfactory plan for M.A.P. Additionally, Father argues that the termination should be set aside because his due process rights under the Fourteenth Amendment to the United States Constitution were violated in the underlying wardship proceedings because the DCS failed to keep him apprised of M.A.P.'s wardship status and of hearing dates after Father consented to M.A.P.'s adoption by relatives and because Father was temporarily without the benefit of counsel.

We conclude that there was sufficient evidence presented to support the termination of Father's parental rights and that Father's due process rights were not violated. Accordingly, we affirm the judgment of the juvenile court.

FACTS

In August 2006, A.S. (Mother) left M.A.P. and his sister M.P. with relatives and did not return for several months.[1] In October 2006, the DCS was notified and officially removed M.A.P. and M.P. from Mother's custody. At the time of removal, Father, having pleaded guilty in 2003 to molesting his prepubescent step-daughter, was incarcerated. After a detention hearing, M.A.P. and M.P. were placed with a maternal aunt and uncle. The DCS thereafter filed a petition alleging M.A.P. and M.P. to be children in need of services (CHINS).

In November 2006, Father appeared telephonically at an initial hearing on the CHINS petition, waived his right to counsel, and admitted a number of allegations. Among other things, Father admitted that he had not financially supported or maintained regular contact with his children, that he was unable to care for them due to his incarceration, that he would further be unable to care for them upon his release from prison due to a parole condition prohibiting him from having contact with minor children, and that he needed the juvenile court's intervention to provide appropriate care and supervision for his children. The juvenile court ordered Father to notify the DCS of any changes in his whereabouts or employment and to participate in a number of services within thirty days of his release from prison, including obtaining a psychological evaluation and a drug and alcohol assessment, enrolling in individual counseling and

---

[1] The parent-child relationship between Mother and M.A.P. was terminated in 2008. Because Mother does not participate in this appeal, our focus is on the facts that pertain to Father.

parenting classes, submitting to random urine screens, and participating in weekly Alcoholics Anonymous or Narcotics Anonymous meetings.

Approximately a month after M.A.P. and M.P. were placed with their maternal aunt and uncle, both children made allegations against Father and his ex-wife of physical abuse, and M.A.P. claimed that Father had molested him. The DCS substantiated the child molest allegation. On May 29, 2007, the DCS filed an additional CHINS petition, in which it repeated a number of Father's previously-admitted allegations but also alleged that Father had molested M.A.P. Father was appointed counsel in June 2007.

On July 13, 2007, Father was released from prison on parole, and he contacted the DCS shortly thereafter to provide his new address. On July 25, 2007, at the initial hearing on the new CHINS petition, Father appeared in person and by counsel and denied molesting M.A.P. He admitted the remaining allegations, and M.A.P. was again found to be a CHINS. The juvenile court again ordered that Father participate in services, and Father was given an additional thirty days to do so.

Five days later, the DCS made referrals to various service providers for Father to participate in a psychological evaluation, a drug and alcohol assessment, a parenting and family functioning assessment, and individual counseling. The DCS also sent Father a letter at the hotel where he was staying advising him that the referrals had been made. Father never participated in any of the referred services.

On September 25, 2007, the juvenile court held a permanency hearing at which Father and his counsel were present. At this hearing, the juvenile court found that Father

4

was non-compliant with the ordered services and that Father "has not demonstrated an ability to benefit from services." Ex. 19 p. 2. The juvenile court then changed the permanency plan with regard to M.A.P. and M.P. from reunification with Mother to termination of parental rights and adoption.

On October 26, 2007, Father executed consents for M.A.P.'s and M.P.'s maternal aunt and uncle to adopt them. According to Father, he consented to his children being adopted by these particular relatives because he was not able to have contact with them because of his parole conditions and because "they were doing well in their care, honor students and t-ball team . . . , [he] didn't want to take that from them." Tr. p. 247. Father also entered into Post-Adoption Contact Agreements with the maternal aunt and uncle that would allow for birthday cards, letters, and photographs to be exchanged annually.

After Father executed the consents for adoption, he and his counsel stopped attending the CHINS hearings. In March 2008, Father and his counsel failed to attend a review hearing, but Father's counsel was provided with a copy of that hearing's order pursuant to Trial Rule 72(D).[2] That order advised Father's counsel of the next hearing. However, neither Father nor his attorney attended the next four hearings, and the juvenile court stopped providing Father and his counsel with Trial Rule 72(D) notice of upcoming hearings. Curiously, Father's counsel attended hearings in July 2009 and January 2010, but at the hearing in January 2010, the juvenile court apparently relieved Father's counsel

---

[2] Indiana Trial Rule 72(D) requires the clerk of the court to "serve a copy [of all orders] upon each party who is not in default for failure to appear and [to] make a record of such service" in the Chronological Case Summary.

of further appearances in light of Father's previously executed consents to adoption. Accordingly, neither Father nor his attorney attended another hearing in the CHINS matter until May 2011, when Father's counsel was re-appointed.

M.P. was later successfully adopted, but due to a number of behavioral problems displayed by M.A.P., his adoption was placed on hold and ultimately abandoned in November 2010 or shortly thereafter. Although his aunt and uncle did not want to give up on adopting M.A.P., ultimately his aunt determined that she could not be M.A.P.'s primary caregiver in light of his special needs, which at the time included aggressive behaviors, and the fact that her husband was often away on business. This decision came only after M.A.P.'s placement with his maternal aunt and uncle was disrupted a number of times when M.A.P. required emergency treatment in residential treatment facilities.

Father began attending CHINS hearings again in July 2011. On August 5, 2011, the DCS filed an amended petition to terminate Father's parent-child relationship with M.A.P.[3] Father was released from parole on October 13, 2011, and in November 2011, he petitioned the court to change M.A.P.'s permanency plan. Specifically, Father requested that the juvenile court adopt a concurrent permanency plan of reunification.[4]

In December 2011, Father provided the DCS with a hat, scarf, gloves, and two comic books for M.A.P, but one of the comic books was not given to M.A.P. because that

---

[3] A previous termination petition was filed in 2008. This petition resulted in Mother's parental rights being terminated. However, given that Father had consented to M.A.P.'s adoption by his maternal aunt and uncle, no fact-finding hearing was held on the original petition as to Father's parental rights.

[4] Although the juvenile court's order on Father's motion is not included in the record, we presume that Father's motion was denied.

6

comic book was "graphically drawn" with female characters who exposed "a lot of cleavage, a lot of legs." Tr. p. 51, 133. M.A.P.'s therapist decided against giving M.A.P. that comic book in light of the fact that M.A.P. was displaying inappropriate sexual behaviors. More particularly, M.A.P. will "expose himself or masturbate in places he shouldn't" or "brush up against people when he should not." Id. at 133. M.A.P. was not told who gave him the items that he received.

A fact-finding hearing was held on the termination petition over four days in January and February 2012. Father testified about his work, housing, and relationship history since his release from prison. Father testified to having five jobs over four and one-half years with multiple months-long periods of unemployment, but he stated that he had been continuously employed for the last nine months. In September 2010, Father's parole officer wrote a letter to the DCS that stated in part that "[Father's] inability to maintain employment has made it difficult for him to take care of himself." Ex. F.

Father's housing situation was similarly unstable after his release from prison. Father lived in a hotel for thirty days before moving into an apartment with a woman he married in January of the next year, but he and his wife were evicted after six months for failing to pay rent. Father's wife then moved in with a woman who had children, but Father was unable to live there because of his parole restrictions prohibiting him from having any contact with children. Instead, Father moved into a one-bedroom duplex that he shared with a roommate until he was able to find a one-bedroom apartment in a four-plex, where he has lived for the past two-and-one-half years. At some point when Father

7

and his wife were living apart, they discussed getting divorced, and Father met someone new. This woman lived with Father for approximately four months. However, after she "went out on a crack binge[,]" Father reunited with his wife. Tr. p. 304.

Father admitted that he did not regularly notify the DCS about changes in his residence or employment because the DCS could just find out by checking the sex offender registry. Father also admitted that he had not attended any parenting classes during his parole because he felt that since he could have "no contact with children . . . there was no reason to have parenting classes at that time." Id. at 302.

Despite Father never participating in the DCS-referred services, Father testified at the termination hearing that he thought he could benefit from services. In fact, Father claimed that he already had. Specifically, Father stated that while he was in prison, he completed a sex offender course. He also stated that he had passed every random urine screen during his parole. Father claimed that he had completed a psychological evaluation in 2007, but he provided no evidence to the DCS or the juvenile court that this evaluation actually took place. Finally, Father testified that he attends a group called Faith-Based Mentoring Ministries every Wednesday.

Father also attempted to establish that he could adequately parent M.A.P. by referring to his relationships with his other children. Although Father claimed to have paid support for a child who was now eighteen years old, Father also admitted that his tax returns were withheld a number of times for arrearages and that his relationship with that child was terminated when she was only three years old. Father also claimed that since

8

2007, he had paid more than $2600 in child support for another child. However, in 2011, Father only made two payments of $10.00 each, and in 2012, the only payment Father made was on the day that Father obtained the computer printout to show that he had been paying child support for this child. Father claimed that he was unable to make a child support payment for M.A.P. on that same date because no account had been set up.

Finally, Father testified that he supports and has a good relationship with B.P., the three-year-old son Father has with his wife. Father was initially prohibited from having any contact with B.P. for the first few years of his life, but he repeatedly sent letters to the parole board asking for permission to see B.P. The first four petitions were denied, but Father was ultimately granted permission to have supervised visitation with B.P. a few months before his parole ended. Despite having a post-adoption contact agreement that allowed Father to write to M.A.P. and M.P. even after they were adopted, however, Father made no such requests to the parole board regarding having contact with them.

Father testified that he wanted to reestablish a connection with M.A.P. through transitional therapy, but he recognized that it would be "impossible, totally impossible" for M.A.P. to start living with him immediately. Tr. p. 238. Not only is Father's current one-bedroom apartment unable to accommodate M.A.P. in addition to Father, his wife, and B.P., Father also voiced concerns about the safety of three-year-old B.P. should M.A.P. start living with them without a transition period.

Indeed, M.A.P. has a number of special needs. He has been diagnosed with mood disorder and Attention Deficit Hyperactivity Disorder (ADHD), and he has displayed

9

impulsivity, aggression, bullying, paranoid thoughts, lying, stealing, problems with interpersonal relationships, and inappropriate sexual behaviors. M.A.P. also has trust issues as a result of repeatedly being abandoned by family members.

A number of other witnesses testified about M.A.P.'s relationship, or lack thereof, with Father. Although M.A.P. lived with Father for over a year when he was very young, he has not seen Father since 2003 when he was approximately four years old. M.A.P.'s maternal aunt testified that when M.A.P. and his sister began living with her, they both referred to Father by his first name and considered another man to be their father.

The DCS family case manager testified that she "wouldn't say that [M.A.P. and Father] have a relationship" and that she has not told M.A.P. that Father has requested visits with him "[b]ecause he doesn't react well to speaking about [Father]." Tr. p. 52, 99. The GAL testified that "[t]here is a biological and a name parent-child relationship" between father and M.A.P. but that "beyond that there's not much of a parent-child relationship and what there is I would not submit as a good one." Id. at 431.

Angela Schwering, a residential therapist for Lutheran Child and Family Services who had worked with M.A.P. since March of 2011, testified that M.A.P. has recounted memories of past physical abuse by Father and that he wants an apology from Father "for the things that happened to him." Id. at 130. When M.A.P. was asked what he would do if he were ever to see Father again, M.A.P. told his therapist that "he thinks he'd want to hurt him," but he "might hug him . . . because that's what you're supposed to do to a dad." Id. at 120. The therapist reported that M.A.P. asks to see his sister but not Father.

10

She also described how when M.A.P. was given various hypothetical situations where he was asked where he would want to live, including the possibilities of relative placement or in a group home, M.A.P. never chose living with Father.

Regarding the possibility of future contact between M.A.P. and father, the therapist testified that "it would be detrimental to [M.A.P.'s] treatment" and that she felt that "reunification would not be a positive thing." Id. at 122-23. Similarly, both the DCS family case manager and the GAL testified that termination of Father's parental rights is in M.A.P.'s best interests and that adoption was a satisfactory plan for M.A.P. despite the fact that one planned adoption had failed. They maintained that another adoption could work for M.A.P. once he was stable.

On May 7, 2012, the juvenile court issued its findings of fact and conclusions of law and ordered that Father's parental rights be terminated. Father now appeals.

DISCUSSION AND DECISION

In challenging the termination of his parent-child relationship with M.A.P., Father raises the following issues: (1) whether the trial court erred by finding that a reasonable probability existed that the reasons M.A.P. was placed outside of Father's home would not be remedied or that the continuation of the parent-child relationship posed a threat to M.A.P.; (2) whether the trial court erred by finding that termination was in M.A.P.'s best interests; (3) whether the trial court erred by finding that adoption was a satisfactory plan for M.A.P.; and (4) whether procedural errors and irregularities in the underlying CHINS matter warrant reversal of the judgment terminating Father's parental rights.

11

## I.  Standard of Review

The traditional right of parents to raise their children is a fundamental liberty interest protected by the United States Constitution.  Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005).  As such, the involuntary termination of parental rights "is intended as a last resort, available only when all other reasonable efforts have failed."  In re I.A., 934 N.E.2d 1127, 1136 (Ind. 2010).  Yet parental rights are not absolute and must be subordinated to a child's interest in a termination proceeding.  Bester, 839 N.E.2d at 147.  The purpose of a termination is not to punish parents but to protect their children.  In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999).

When reviewing a juvenile court's decision to terminate parental rights, we neither reweigh the evidence nor judge the credibility of witnesses.  Bester, 839 N.E.2d at 147.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment and will reverse only if the judgment is clearly erroneous.  Id.  Because the juvenile court made specific findings of fact and conclusions of law in its order terminating Father's parental rights, we apply a two-tiered standard of review.  Id.  First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment.  Id.

## II.  Sufficiency of the Evidence

When the DCS seeks to terminate a parent-child relationship, it must plead and prove, in pertinent part, the following statutory elements:

12

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B)-(D). These elements must be proved by clear and convincing evidence. Bester, 839 N.E.2d at 148. We note that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and thus requires only one of the three elements under subsection (B) to be proven. Id. at 148 n.5.

A. Conditions Unlikely to be Remedied or Threat Posed

Father first argues that the juvenile court erred in finding that a reasonable probability exists that the conditions that resulted in M.A.P.'s placement outside his home will not be remedied or, in the alternative, that the continuation of the parent-child relationship poses a threat to M.A.P. When examining these issues, the juvenile court must judge one's fitness to parent at the time of the termination hearing, taking into consideration evidence of changed circumstances. Id. at 152. The juvenile court must also evaluate a parent's habitual pattern of conduct to determine if future changes are likely. In re B.M., 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). The juvenile court may

consider the services offered by the DCS and the parent's response to those services. In re B.D.J., 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). However, "[t]he time for parents to rehabilitate themselves is during the CHINS process, prior to the filing of the petition for termination." B.M., 913 N.E.2d at 1287 (internal quotations and emphasis omitted).

Father submits that the reason for M.A.P.'s original placement outside his home was due solely to his incarceration and the parole conditions that prohibited him from having contact with M.A.P. Father thus contends that because he has been released from prison and discharged from parole, the juvenile court erred in finding that the reasons for M.A.P.'s placement outside his home would not be remedied. Father also asserts that his life has changed dramatically since he was released from prison, and he identifies his current marriage and relationship with his three-year-old son, his now-stable employment and housing, and his participation in various services as factors indicating that the conditions which led to M.A.P.'s placement outside his home have been remedied.

First, the evidence does not support Father's position that his incarceration and parole restrictions were the only reasons why he was not considered for placement of M.A.P. Importantly, Father neglects to take into consideration that he is a convicted child molester and that M.A.P. has accused Father of molesting and physically abusing him in the past. Moreover, despite Father's assurances that he has completely changed his life, Father had multiple periods of unemployment over the last several years and has made poor relationship decisions. Father has never participated in any of the services he was ordered to complete during the CHINS proceedings. Although Father petitioned the

14

Parole Board numerous times for permission to see B.P., he never asked for permission to contact M.A.P., even though he had entered into an agreement that allowed Father to have contact with M.A.P. even after he was adopted. And with the exception of a few items of winter clothing that Father gave to M.A.P. in December 2011, Father has failed to support not only M.A.P. but his other children as well. Finally, Father testified that it would be "impossible" for M.A.P. to live with him at the time of the termination hearing. This evidence is sufficient to show that the reasons for M.A.P.'s continued placement outside Father's home are unlikely to be remedied. The evidence that Father advances suggesting otherwise is merely a request to reweigh the evidence, which we may not do.[5]

## B. Best interests

Father next contends that the DCS failed to sufficiently prove that termination was in M.A.P.'s best interests. In determining the best interests of a child, the juvenile court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired before terminating the parent-child relationship. In re A.A.C., 682 N.E.2d 542, 545 (Ind. Ct. App. 1997).

Here, M.A.P. has not seen Father in nearly ten years, he never asks to see him, and even before he was removed, he considered another man to be his father. Both the DCS

---

[5] As noted above, the statute is disjunctive and requires that the DCS prove either that there was a reasonable possibility that the conditions for M.A.P.'s placement outside the home will not be remedied or the continuation of the parent-child relationship poses a threat to M.A.P. Because we find sufficient evidence for the first element, we need not consider the second.

family case manager and the GAL testified that termination of the parent-child relationship was in M.A.P.'s best interests. Furthermore, M.A.P.'s therapist testified that reunification with Father would be counter-productive to M.A.P.'s treatment. Finally, the juvenile court found that it would be against M.A.P.'s best interests to place him with a convicted child molester, especially when he has already exhibited inappropriate sexual behaviors and diminished coping skills. Accordingly, the trial court's conclusion that termination was in M.A.P.'s best interests was fully supported by the evidence.

## C. Satisfactory plan

Father next argues that because of M.A.P.'s age and special needs, adoption is not a satisfactory plan for him. Specifically, Father contends: "Adoption has not worked for this child. Now that he is older and he continues to act out, sometimes sexually, the likelihood of his being adopted is almost non-existent." Appellant's Br. p. 12. Contrary to Father's assertions, however, one failed adoption does not mean that M.A.P., once stable, will never be able to find an adoptive family. Moreover, the DCS was not required to show that there was already a family waiting to adopt M.A.P. at the time of the termination hearing. See In re S.L.H.S., 885 N.E.2d 603, 618 (Ind. Ct. App. 2008) (stating that the plan only needs to provide "a general sense of the direction in which the child will be going after the parent-child relationship is terminated").

## III. Due Process

Finally, Father contends that the termination judgment must be vacated because of numerous procedural errors and irregularities during the underlying CHINS proceedings.

16

Specifically, Father takes issue with the DCS's failure to seek meaningful participation or compliance by Father, the DCS's failure to inform him that M.A.P.'s adoption had been abandoned, the DCS's and the juvenile court's failure to keep him and his counsel apprised of the dates of future court hearings, and the fact that Father was without the benefit of counsel for a period of time during the CHINS proceedings.[6] Father maintains that these errors violated his due process rights under the Fourteenth Amendment to the United States Constitution.[7]

This Court has previously held that "procedural irregularities in . . . CHINS proceedings may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." A.P. v. Porter Cnty. Office of Family & Children, 734 N.E.2d 1107, 1112-13 (Ind. Ct. App. 2000). In A.P., we held that "when . . . a record is replete with procedural irregularities throughout CHINS and termination proceedings that are plain, numerous, and substantial, we are compelled to reverse a termination judgment on procedural due process grounds." Id. at 1118.

Not all procedural irregularities mandate reversal of a termination judgment, however. To determine whether a procedural due process violation exists, we engage in a

---

[6] Father also contends that his due process rights were violated because the juvenile court often took several months to issue its written court orders after hearings. However, Father fails to provide a cogent argument showing how these delays could cause an increased risk of error in the termination proceedings. Accordingly, Father's argument on this issue is waived. Castro v. State Office of Family & Children, 842 N.E.2d 367, 378 n.2 (Ind. Ct. App. 2006).

[7] Father contends that both his substantive and procedural due process rights were violated. However, with regard to his substantive due process argument, Father cites to no cases that address this issue and fails to develop a cogent argument. Accordingly, Father's substantive due process argument is waived. Castro, 842 N.E.2d at 378 n.2.

balancing test and weigh the private interests affected by the proceeding, the risk of error created by the State's chosen procedure, and the countervailing governmental interest supporting use of the challenged procedure. Id. at 1112. We also keep in mind that at its very core, due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotations and citation omitted).

A. Failure to Make Reasonable Efforts or to Inform of Abandoned Adoption

Father first argues that his due process rights were violated because the DCS failed to make reasonable efforts to reunify him with M.A.P. and to inform him that M.A.P.'s relative placement had decided not to adopt him. The DCS's duty to make reasonable efforts to reunify families is codified at Indiana Code section 31-34-21-5.5. When a child has been removed, this section requires the DCS to make reasonable efforts "to make it possible for the child to return safely to the child's home as soon as possible." Ind. Code § 31-34-21-5.5(b)(2). "In determining the extent to which reasonable efforts to reunify or preserve a family are appropriate under this chapter, the child's health and safety are of paramount concern." I.C. § 31-34-21-5.5(a).

Moreover, reasonable efforts are not required if the juvenile court makes a finding that: (1) the parent has been convicted of certain offenses; (2) the parent's rights have been involuntarily terminated with respect to the one of the child's siblings; or (3) the child is an abandoned infant. I.C. § 31-34-21-5.6. Similarly, if the juvenile court has approved a permanency plan for a child that is inconsistent with the continuation of

18

reasonable efforts to reunify a child with a parent, the DCS's duty to provide reasonable efforts changes to a duty to make reasonable efforts to place the child in an out-of-home placement and to finalize the permanent placement of the child. I.C. § 31-34-21-5.8.

In the instant case, it appears that the DCS followed or exceeded the statutory guidelines for providing reasonable efforts to Father. Given either Father's conviction for molesting his step-daughter or the previous involuntary termination of his parental rights with respect to his eighteen-year-old child, it appears that the DCS could have requested that the juvenile court make a finding that reasonable efforts were not required. However, the DCS did not do so, and thus Father is correct that there was never an explicit finding in the CHINS proceedings that reasonable efforts were not required.

However, it nevertheless appears that reasonable efforts were made by the DCS. When Father was first released from prison, the DCS made several referrals for Father to participate in services. Father failed to participate in these referred services even after he was given additional time to do so. Based on Father's failure to benefit from services, the juvenile court adopted a permanency plan of termination of parental rights and adoption for M.A.P. At that time, the DCS was no longer required to provide Father with reasonable efforts to reunify.

Given these circumstances, we cannot say that the DCS failed in its duty to provide reasonable efforts to reunify M.A.P. with Father or that the DCS violated Father's due process rights by not advising him of M.A.P.'s abandoned adoption. The permanency plan adopted by the juvenile court was premised on Father's failure to

19

benefit from services, not on Father's consent to M.A.P.'s adoption. Thus, the instant case is distinguishable from In re K.L., 922 N.E.2d 102 (Ind. Ct. App. 2010). See K.L., 922 N.E.2d at 109 (setting aside the voluntary termination of a father's parental rights when he based his consent to his child's adoption on a misrepresentation made by the DCS about the adoptive parents and he had been benefiting from services beforehand).

## B. Notice of Court Hearings

Father next contends that his procedural due process rights were violated because he and his counsel were regularly not provided with notice of hearings in the underlying CHINS proceedings. Father focuses his argument on several instances where, according to the certificates of service on the juvenile court's orders, he and his counsel were not given Trial Rule 72(D) notice of upcoming hearings. Indiana Trial Rule 72(D) provides that "[i]mmediately upon the notation in the Chronological Case Summary of a ruling upon a motion, an order or judgment, the clerk shall serve a copy of the entry . . . upon each party who is not in default for failure to appear . . . ." It is undisputed that most of the court orders from August 2008 until February 2011 failed to give either Father or his counsel Trial Rule 72(D) notice of upcoming hearings.

Father also claims that the DCS failed to provide him with the statutorily-required notice of upcoming hearings.[8] Father does not contend that he was denied notice of any

---

[8] Father raises this issue for the first time in his reply brief. Issues raised for the first time in a reply brief are waived. In re C.G., 933 N.E.2d 494, 512 n.2 (Ind. Ct. App. 2010). However, this court prefers to address cases on their merits where possible. In re S.P.H., 806 N.E.2d 874, 877 (Ind. Ct. App. 2004). Accordingly, waiver notwithstanding, we will address the merits of Father's claim that the DCS failed to give him the required notice.

20

initial or dispositional hearings; rather, he contends that neither he nor his counsel was given notice of several periodic review, permanency, and detention hearings that occurred later in the CHINS proceedings.

We first note that most, if not all, of the court orders in the CHINS proceedings state regarding the next scheduled hearing that the "parties are ordered to appear without further notice" or that "[n]otice is hereby given to those parties and individuals appearing in court this date pursuant to I.C. 31-32-1-4." Exs. 10, 12-15, 18-20, 22-34. Indiana Code section 31-32-1-4(d) provides that "[w]ritten notice is not required if verbal notice . . . is given by the court at an earlier hearing or proceeding at which the individual is notified to be present." Thus, for any hearings where Father or his attorney attended the prior hearing, written notice was not required.

However, for each of the hearings that neither Father nor his attorney attended, the DCS was statutorily required to provide him with notice of upcoming periodic review and permanency hearings at least seven days beforehand. I.C. §§ 31-34-21-4(a), (b); 31-34-21-7(c)(1). And for the multiple detention hearings that were held when M.A.P. required more intensive treatment, the DCS was required to give notice to Father sometime before the hearings, provided they could locate him. I.C. § 31-34-5-1.

In both of the relevant permanency orders where neither Father nor his counsel attended the previous review hearing, the juvenile court found that "notification . . . was properly served on all required persons pursuant to I.C. 31-35-2-6.5 or in the alternative, notice was waived." Exs. 25, 30. But for each of the relevant review hearing orders, the

21

juvenile court made no findings as to whether the required notice was given. Exs. 22, 26, 32. The juvenile court also made no findings as to whether notice was given to Father for any of the detention hearings. Exs. 23, 24, 28, 31.

In A.P., we observed that the private interests of parents in termination proceedings are "commanding" and that "there is no apparent governmental interest that would justify a disregard of procedures set forth by our legislature." 734 N.E.2d at 1117-18. However, even assuming it was error for the juvenile court and the DCS not to provide Father and his counsel with the required notice, we conclude that there was no due process violation because Father has not shown that he was prejudiced in the termination proceedings by a substantial risk of error as a result of these mistakes. See id. at 1118 (concluding that it was the risk of error inherent in the accumulation of multiple procedural errors, rather than from any one alone, that required reversal of the termination judgment).

In the instant case, we note that Father's lack of notice was due at least in part to his own neglect in failing to attend the hearings of which he had notice. Father admits that he was never excused from attending hearings in the CHINS proceedings. Had Father continued attending hearings after he consented to M.A.P.'s adoption, he would have been verbally notified of each of the periodic review and permanency hearings and thus would have remained informed about M.A.P.'s placement and adoption status.

And despite the lack of notice, Father's counsel appeared at two hearings in the CHINS proceedings in mid-2009 and early 2010. Exs. 26, 27. However, Father's

counsel raised no challenges to the permanency plan at either hearing. Indeed, throughout this entire time period until approximately November 2010 or shortly thereafter, the permanency plan for M.A.P. was termination of parental rights with adoption by his maternal aunt and uncle, an adoption to which Father had consented. With the exception of an emergency detention hearing held in February 2011, the only hearing held between the time when the relative placement decided against adopting M.A.P. and the time when Father's counsel was reappointed was a permanency hearing that took place in December 2010. Ex. 30.

Keeping these circumstances in mind, we conclude that Father was never deprived of the opportunity to be heard at a meaningful time and in a meaningful manner. Once it was clear that the adoption to which Father had consented had fallen through, Father's attorney was reappointed and he again began receiving notice of upcoming hearings. Thus, we cannot say that Father's procedural due process rights were violated. See Hite v. Vanderburgh Cnty. Office of Family & Children, 845 N.E.2d 175, 184 (Ind. Ct. App. 2006) (determining that a father was not denied procedural due process when, although he was not given proper notice of the initial CHINS petition and early hearings, he was provided with a meaningful opportunity to be heard in later hearings).

### C.  Right to Counsel in CHINS Proceedings

Finally, Father argues that he was denied the effective assistance of counsel for a period of time during the underlying CHINS proceedings when he and his counsel "were lulled into a sense of false security that the adoption for [M.A.P.] was progressing, and

that, therefore, neither of them needed to remain active in the case." Appellant's Br. p. 16. Father also claims that he was completely denied the benefit of counsel beginning in January 2010 when his counsel was told that he need not appear at any future hearings in the matter and ending in May 2011 when his counsel was reappointed.

Although juvenile courts are required to appoint counsel for indigent parents in termination proceedings, there is not an analogous absolute right to an attorney in a CHINS proceeding. In re L.B., 889 N.E.2d 326, 335 (Ind. Ct. App. 2008). Rather, the decision of whether to appoint and retain pauper counsel in a CHINS proceeding rests with the sound discretion of the juvenile court. Id. An abuse of this discretion will be found only if a parent is able to demonstrate that a termination hearing would have produced a different result had the parent been represented by counsel during the CHINS proceedings. Id. at 336.

Our review of the record indicates that Father was represented by counsel at every critical phase in the underlying CHINS proceedings.[9] Father was represented by counsel when he admitted to a number of allegations in the second CHINS petition, when the juvenile court ordered Father to participate in services, when M.A.P.'s permanency plan was changed to termination of parental rights, when Father decided to consent to M.A.P.'s adoption by his maternal aunt and uncle, and within a month or so from when

---

[9] Father was not represented by counsel when he admitted to a number of the allegations in the first CHINS petition because Father explicitly waived his right to counsel at that hearing. But when the second CHINS petition was filed, Father was appointed counsel and admitted to substantially the same allegations. Thus, Father has shown no prejudice resulting from a lack of appointed counsel at that time.

24

that adoption was finally abandoned by M.A.P.'s relatives. We also note that Father's counsel did not object to his discharge in January 2010.

In addition, Father has not demonstrated that the termination proceedings would have produced a different result had he had the benefit of counsel during the time period when he and his attorney were allegedly "lulled" into dormancy. Father's counsel attended two hearings in late 2009 and early 2010, but there is no indication that Father's counsel objected to M.A.P.'s permanency plan at either hearing. In fact, Father did not move for a change in M.A.P.'s permanency plan until November 2011, which was two months after the DCS had filed an amended petition to terminate Father's parental rights and six months after he had been reappointed counsel. Ex. I. Accordingly, Father has failed to show how having counsel during the CHINS proceeding would have changed the evidence presented at the termination hearing when Father waited so long to challenge M.A.P.'s permanency plan even after he knew that the adoption by M.A.P.'s relatives had failed.

In conclusion, the juvenile court did not err in finding that the DCS met its burden on the termination petition by clear and convincing evidence, and Father has failed to show that the termination judgment should be set aside because his procedural due process rights were violated in the underlying CHINS proceedings.

The judgment of the juvenile court is affirmed.

RILEY, J., and BARNES, J., concur.