NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-715                                            Appeals Court

C.M.  vs.  COMMISSIONER OF THE DEPARTMENT OF CHILDREN AND
                    FAMILIES & others.[1]


No. 18-P-715.

Suffolk.      June 13, 2019. - April 22, 2020.

Present:  Meade, Agnes, & Henry, JJ.


Department of Children & Families.  Minor, Care and protection.
     Parent and Child, Care and protection of minor.  Due
     Process of Law, Care and protection of minor.  Civil
     Rights, Immunity of public official.  Immunity from suit.
     Constitutional Law, Conduct of government agents.
     Practice, Civil, Care and protection proceeding, Civil
     rights, Judgment on the pleadings, Summary judgment,
     Affidavit.  Federal Civil Rights Act.



     Civil action commenced in the Superior Court Department on
September 16, 2014.

     The case was heard by Rosemary Connolly, J., on a motion
for summary judgment and a motion for judgment on the pleadings,
and entry of separate and final judgment was ordered by Paul D.
Wilson, J.


     Eric B. Tennen for the plaintiff.
     Jesse M. Boodoo, Assistant Attorney General (Abigail Fee,
Assistant Attorney General, also present) for the defendants.

_____

     [1] Candice Gemski and Marcie Plouffe.

HENRY, J. This case presents the question of the degree of immunity accorded a defendant social worker in a damages action under 42 U.S.C. § 1983[2] when it is alleged that the social worker "knowingly and willingly misled" the Juvenile Court in order to allow the Department of Children and Families (DCF) to obtain temporary custody of a child. Here, a mother, C.M., alleges that DCF improperly obtained custody of her then seven year old child by filing an ex parte care and protection petition supported by an affidavit that contained knowingly false statements and by testifying falsely during the hearing on that petition. DCF obtained and maintained physical custody of the child for fifty-one days, until a Juvenile Court judge ordered DCF to return the child to her mother's care. DCF kept legal custody of the child for another five months until May 2012, when a Juvenile Court judge ordered the care and protection case dismissed.

The mother brought this action in Superior Court against the commissioner of DCF and two DCF employees, Marcie Plouffe and Candice Gemski. The mother sought injunctive relief against DCF and monetary damages against Plouffe and Gemski for

---

[2] "The text of [§ 1983] purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." Kalina v. Fletcher, 522 U.S. 118, 123 (1997).

violations of § 1983.  While discovery was ongoing, DCF moved for summary judgment, and Plouffe and Gemski moved for judgment on the pleadings.  Both motions were allowed and a separate and final judgment pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), entered in their favor.[3]  The mother appeals.  We affirm in part, vacate in part, and remand for further proceedings.

Background.  In reviewing the ruling on the motion for judgment on the pleadings, we are required to take the allegations of the complaint as true.  See Jones v. Brockton Pub. Mkts., Inc., 369 Mass. 387, 388 (1975).  In considering the ruling on DCF's motion for summary judgment, we are required to review the facts in the light most favorable to the nonmoving party, the mother.  See Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).

The child was born in 2003.  DCF's involvement with the mother and her daughter dates back to 2004, when DCF received a report that the child's father was a level three sex offender. The child's father did not live with the child, but had frequent visitation.[4]  DCF investigated the report and closed the case

_____

[3] The child is another plaintiff in the matter, but she does not assert claims against the defendants in this appeal.

[4] At the time of the motion for summary judgment, the father was registered as a level two sex offender.  The mother asserts that the father has not committed any offenses in over twenty

after the parents voluntarily entered into their first safety plan with DCF.  This plan provided that the father would not be left alone with the child "except for short intervals such as mother's going to the bathroom, doing chores around the house, etc."

Several years later, in 2009, DCF received a report indicating that the father was a level three sex offender, the child had been telling others that her vagina hurt, and the child was "touching herself."  After investigating, DCF made a finding of neglect and again closed the case after the parents agreed to a second safety plan.  The second safety plan provided that at all times that the father was with the child and not at a public venue, he would be supervised by the mother or his girlfriend and that in case of an emergency, "all reasonable efforts will be made to provide alternative supervision."  When an alternative could not be found, the father would care for the child "until such alternative care can be found."  Emergency was defined as including "[d]eath in the immediate family"; "[i]llness/emergency care for [the child]"; and "[the mother's] illness or hospitalization."

---

years, during which time he also has been sober.  A psychologist who specializes in sex offender treatment examined the father and concluded that the father is unlikely to reoffend, and is extremely unlikely to offend against his daughter.

That brings us to the events that led to the removal of the child from the mother's care and custody. In May 2011, when the child was seven years old, DCF received a G. L. c. 119, § 51A, report that the child might be having unsupervised contact with the father. The report identified -- and the mother admitted -- two sets of circumstances in which the child had been left unsupervised with the father. First, the mother left the child with the father at an urgent care doctor's appointment while the mother went to a previously scheduled dentist appointment for replacement of a crown. The child's doctor ordered her to have X-rays. The father transported her to the hospital for X-rays and then home, where the mother met them immediately. Second, when the doctor ordered the mother to keep the child home until she had completed five days of medication, the mother left the child home alone with the father for two days because the mother could not take time off from work or find alternate care. A DCF investigator interviewed the child, who was able to tell the difference between a good and bad touch and stated that her father had never touched her inappropriately.

DCF again found the mother to be in neglect for allowing the child to have unsupervised contact with the father. The mother contends that no circumstance mentioned above should have supported the finding of neglect because the contacts involved

emergencies.[5]  Following the finding of neglect, Plouffe, a DCF case worker, began working with the family.

Plouffe's relationship with the mother often was acrimonious.  As alleged in the mother's amended complaint, Plouffe did not work to "strengthen and encourage family life," and instead "simply identified perceived deficits in, and problems with," the mother's support system.  Plouffe did not identify supports to help the mother with day-to-day issues.  The mother further alleged that Plouffe faulted the mother for her behavior, first criticizing her for being too upset and then criticizing her for being too calm.

As alleged in the first amended complaint, in August 2011, the parents agreed to the father having no unsupervised contact with the child "for the time being."  The mother alleges that at an August 30, 2011, meeting, Gemski, a DCF area program manager and Plouffe's supervisor, incorrectly maintained that the mother was allowing the father to have ongoing contact with the child and was not following DCF's safety plan.

On October 5, 2011, DCF proposed a third safety plan.  "All the parties agreed on the provisions prohibiting unsupervised

---

[5] In addition, the father took the child on a camping trip, during which the father's girlfriend, who was approved by DCF to supervise visitation, was also present.  Given that the father was supervised by the girlfriend, the mother contends that this was not a violation of the second safety plan.

contact between [the child] and her father."  The plan, however, contained many provisions the mother had not agreed to, including requirements that the mother and the child attend therapy, that the mother sign "open releases of . . . private health information to DCF," and that the father leave the house if the mother was showering.  When the mother expressed concerns regarding these additional provisions, Plouffe ended the conversation.

On October 31, 2011, without any further conversation regarding the third safety plan, Plouffe informed the mother that DCF would be seeking temporary custody of the child.  On November 1, 2011, DCF filed a care and protection petition in the Juvenile Court seeking temporary custody of the child.  The mother alleges that the reasons Plouffe stated in her affidavit in support of the petition that the removal was necessary -- the mother "refusing to sign the October 5, 2011 draft of a revised [s]afety [p]lan, the refusal to agree to forcing [the child's] father to leave the home if [the mother] took a shower, and refusal to force [the child] into sexual abuse therapy -- were wholly unsupported by any evidentiary basis for seeking them." The mother alleged that Gemski approved Plouffe's actions.

The mother also alleged that at a hearing on the petition, Plouffe falsely testified on two points:  (1) that the mother "is allowing . . . the father, a level three sex offender, [to

have] unsupervised contact with the child"; and (2) that the mother "has refused to sign the safety plan."  As alleged in the mother's complaint, these statements were false, were approved by Gemski, and were knowingly and willingly made to mislead the Juvenile Court.[6]

Following the hearing, the Juvenile Court ordered temporary custody of the child to DCF.  The case then proceeded to a seventy-two hour hearing after which the child remained in DCF's physical and legal custody.  The child was placed in foster care and a new school.  The mother alleges that Plouffe and Gemski did everything in their power to keep the child away from the mother even if she agreed to no contact with the father during the pendency of the care and protection proceeding.

On December 19, 2011, the Juvenile Court ordered the child returned to the mother pending final disposition of the matter. In April 2012, a court appointed investigator submitted a written report to the Juvenile Court recommending that the care and protection proceeding be dismissed contingent upon the

---

[6] DCF's brief suggests that we "could reject as implausible the contention that there was anything false in Plouffe's statements."  We disagree, as this is a question of fact that would be inappropriately decided on a motion for judgment on the pleadings.  At argument, DCF rightly acknowledged that its absolute immunity argument assumes, for the sake of argument, the falsity in Plouffe's testimony.  Plouffe similarly agreed at the hearing on the motion for judgment on the pleadings that for the sake of argument, the judge should assume Plouffe lied to the Juvenile Court judge when seeking emergency removal.

family's agreement to a new safety plan drafted by an independent psychologist. The mother asserts that the parties adopted this safety plan (the 2012 plan), which called for a DCF case manager/coordinator to evaluate the family's progress after six months to a year. The parties do not agree whether this 2012 plan or any safety plan is currently in place, and if it is, whether DCF is a party to it. DCF contends that to the extent the mother considers herself subject to a current safety plan, it does not involve DCF; rather, it involves the independent psychologist. The Juvenile Court dismissed the care and protection petition on May 14, 2012. DCF closed the case in July 2012.

In a careful decision, the motion judge ruled that Plouffe and Gemski are absolutely immune from liability for the mother's allegations pursuant to § 1983 for the functions of investigating and prosecuting the removal proceeding. The judge rightly noted that the mother's allegations, if true, should be of grave concern to DCF and the citizens of the Commonwealth. The judge also recognized the public interest in safeguarding children from abuse and neglect by their parents and the risk that a DCF worker who suspects a child is in danger could be inhibited from acting by fear of being sued and personal financial ruin. The judge allowed summary judgment to DCF on the mother's claims for injunctive relief.

Discussion.  We first address Plouffe's and Gemski's motion for judgment on the pleadings, which raises questions of immunity.  Then we address the mother's request for injunctive relief against DCF.

1.  Absolute and qualified immunity generally.  Plouffe and Gemski argue that they are entitled to absolute immunity from the mother's substantive due process claim.  They allege that their actions fell within the scope of their quasi prosecutorial function in initiating care and protection proceedings and that they therefore are protected by absolute social worker immunity and absolute witness immunity.  Before turning to their specific arguments, we briefly review the law concerning absolute and qualified prosecutorial immunity.[7]

---

[7] Qualified immunity is an affirmative defense and the defendants have the burden of proof.  Cristo v. Evangelidis, 90 Mass. App. Ct. 585, 590 (2016).  "[T]he relevant inquiry on summary judgment as to the defense of qualified immunity is whether a reasonable official could have believed his actions were lawful, in light of clearly established law and the information possessed by the official at the time he acted." Clancy v. McCabe, 441 Mass. 311, 322 (2004).  We apply a three-part test, which asks "(1) whether the facts taken in the light most favorable to the plaintiff demonstrate that there was a violation of the plaintiff's . . . constitutional or statutory rights; (2) if so, whether at the time of the violation those rights were clearly established; and (3) whether a reasonable person in the defendant's position would understand that his conduct violated those clearly established rights" (footnote omitted).  Cristo, supra at 590.  The parties have not briefed this question and we do not decide it.

"Implicit in the idea that officials have some immunity -- absolute or qualified -- for their acts, is a recognition that they may err.  The concept of immunity assumes this, and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all." Scheuer v. Rhodes, 416 U.S. 232, 242 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183, 191 (1984).  Absolute prosecutorial immunity, unlike qualified immunity, "applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff" (quotation omitted).  Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985).  See Dinsdale v. Commonwealth, 424 Mass. 176, 179-182 (1997) (assistant attorneys general entitled to absolute immunity in civil litigation); Reid v. New Hampshire, 56 F.3d 332, 337 (1st Cir. 1995) (prosecutors entitled to absolute immunity for repeatedly misleading court).  See also Meade, The Necessity and Reach of Prosecutorial Protections from Suit, 90 Mass. L. Rev. 106 (2006).  The concern is to protect the function of the office by protecting the prosecutor from harassing litigation so that the prosecutor may exercise independent judgment in deciding which actions to bring.  See Kalina v. Fletcher, 522 U.S. 118, 125 (1997); Dinsdale, 424 Mass. at 181.

The United States Supreme Court has "been quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant" (quotations and citation omitted). Burns v. Reed, 500 U.S. 478, 487 (1991). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Id. at 486-487.

In determining questions of qualified and absolute immunity under § 1983, the Supreme Court reads the statute "in harmony with general principles of tort immunities and defenses rather than in derogation of them." Imbler v. Pachtman, 424 U.S. 409, 418 (1976). As explained in Malley v. Briggs, 475 U.S. 335, 339-340 (1986):

> "[The] initial inquiry is whether an official claiming immunity under § 1983 can point to a common-law counterpart to the privilege he asserts. If an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the [next inquiry is] whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions" (quotation and citation omitted).

The Supreme Court has made clear that this is a functional approach, and that it is "the nature of the function performed, not the identity of the actor who performed it," that informs our immunity analysis. Kalina, 522 U.S. at 127.

Applying these principles, the Supreme Court has concluded that prosecutors are absolutely immune from civil suits for

damages under § 1983 for their actions in "initiating a prosecution and in presenting the State's case." Imbler, 424 U.S. at 431. The Supreme Court has since recognized specific functions that are integral to the absolute prosecutorial immunity recognized in Imbler that are thus also accorded absolute immunity. These functions include appearing "in court in support of an application for a search warrant and the presentation of evidence at that hearing," Burns, 500 U.S. at 492, and "prepar[ing] and filing . . . [a criminal] information and [a] motion for an arrest warrant," Kalina, 522 U.S. at 129. Such actions "occur in the course of [the prosecutor's] role as an advocate for the State [and] are entitled to the protections of absolute immunity." Id. at 126, quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

The Supreme Court, however, has rejected claims to absolute immunity for a prosecutor's advice to police during a criminal investigation, Burns, 500 U.S. at 495-496, a prosecutor's fabrication of evidence before the grand jury that led to an indictment, Buckley, 509 U.S. at 275-276, and a prosecutor's statements to the press in announcing an indictment, id. at 276-278. Because such actions do not fall within the advocate's role, "a prosecutor [who engages in these activities] is in no different position than [any] other executive official[] [for whom] qualified immunity is the norm." Id. at 278.

The Supreme Court also has specifically addressed the question of immunity for complaining witnesses. When § 1983 was enacted, "the term 'complaining witness' was used to refer to a party who procured an arrest and initiated a criminal prosecution." Rehberg v. Paulk, 566 U.S. 356, 370 (2012). Prosecutors act as complaining witnesses, not advocates, when attesting to the facts in arrest warrant applications and criminal complaints, and they are not absolutely immune from civil suits for damages under § 1983 for those actions. Indeed, the Supreme Court has rejected a claim of absolute immunity for a prosecutor's false statements made in an affidavit that was attached to an application for an arrest warrant. Kalina, 522 U.S. at 129-131. The Supreme Court recognized that the prosecutor was functioning as an advocate and exercising her professional judgment when she drafted the affidavit, when she determined that the evidence justified a probable cause finding, and when she presented the information and motion to the court. However, "[t]estifying about facts is the function of the witness, not of the lawyer." Id. at 130. Because the prosecutor was functioning as a "complaining witness" and not as "an advocate" for the State when she attested to the facts in the affidavit, she was entitled to qualified, not absolute, immunity. Id. at 131. It is true that the State law in that case required that an application for an arrest warrant be sworn

or certified under penalty of perjury.  Id. at 129.  However, any competent witness could perform that task; it was not "necessary for the prosecutor to make that certification."  Id. 120-130.

  a.  Social workers and immunity.  i.  Filing care and protection petition.  Plouffe was a DCF case worker and Gemski was her supervisor.[8]  To the extent that the mother is challenging the filing of the care and protection petition, Plouffe and Gemski enjoy absolute immunity.  See Kalina, 522 U.S. at 129; Imbler, 424 U.S. at 431.  As the United States Court of Appeals for the Ninth Circuit explained in Miller v. Gammie, 335 F.3d 889, 896-898 (9th Cir. 2003), the initiation and pursuit of child dependency proceedings are prosecutorial in nature and therefore "likely entitled to absolute immunity." Id. at 896-898.  See Millspaugh v. County Dep't of Pub. Welfare of Wabash County, 937 F.2d 1172, 1176-1177 (7th Cir. 1991) (social worker entitled to absolute immunity in child custody case when presenting case to court); Vosburg v. Department of Social Servs., 884 F.2d 133, 135 (4th Cir. 1989) (in filing removal petition, social worker was acting in prosecutorial

---

  [8] The mother also argues that Plouffe is not entitled to absolute immunity because she was not a licensed social worker at the time of her actions.  This argument is unavailing, as we look to the functions Plouffe was performing, not to her title or license status.  See Forrester v. White, 484 U.S. 219, 229 (1988).

capacity and afforded absolute immunity from any liability arising from this function); Minor v. State, 819 N.W.2d 383, 398 (Iowa 2012) (social worker who refers case to county attorney for possible child in need of assistance petition "is performing a function analogous to that of a prosecutor" and is afforded absolute immunity).

ii.  False statements in an affidavit supporting care and protection petition.  We next turn to the mother's allegation that Plouffe, with Gemski's approval,[9] made false statements in an affidavit in support of the care and custody petition and that those false statements were knowingly and willingly made to mislead the Juvenile Court.  In Massachusetts, a care and protection proceeding is initiated by a person filing a care and protection petition identifying the parties and affirming that a child under the age of eighteen within the jurisdiction is in need of care and protection within the meaning of the statutory criteria set forth in G. L. c. 119, § 24.  The petition is typically filed by a DCF employee but it does not have to be and is signed under the pains and penalties of perjury.[10]  It must

---

[9] The parties do not dispute that Gemski's immunity for approving Plouffe's actions is the same as Plouffe's immunity, and we agree.  See Van de Kamp v. Goldstein, 555 U.S. 335, 345 (2009).

[10] "The person filing a care and protection petition must allege 'under oath' that a child:  '(a) is without necessary and proper physical or educational care and discipline; (b) is

allege facts satisfying the statutory criteria.  See Care & Protection of Lillian, 445 Mass. 333, 337 (2005).

The mother argues that Plouffe was functioning as a complaining witness, similar to the prosecutor in Kalina, when she submitted the affidavit in support of the petition and that Plouffe and Gemski are thus not entitled to absolute immunity. We agree.  The same reasoning that applied to the prosecutor in Kalina applies here, where a social worker files an affidavit in support of a care and protection petition.

Numerous courts have analyzed the question of immunity in the context of a care and protection petition and adopted this approach.  See Austin v. Borel, 830 F.2d 1356, 1361-1363 (5th Cir. 1987) (child protection workers were not entitled to absolute immunity for their conduct in filing allegedly false verified complaint); Millspaugh, 937 F.2d at 1176 (social worker's application for ex parte order to have children taken into custody "was much like a police officer's affidavit seeking a search warrant, which . . . falls outside the scope of absolute immunity"); Miller, 335 F.3d 889, 896-898 (recognizing

---

growing up under conditions or circumstances damaging to the child's sound character development; (c) lacks proper attention of the parent, guardian with care and custody or custodian; or (d) has a parent, guardian or custodian who is unwilling, incompetent or unavailable to provide any such care, discipline or attention . . . .'"  Care & Protection of Lillian, 445 Mass. at 337, quoting G. L. c. 119, § 24.

that Kalina requires narrow scope for absolute immunity and parsing each action by social worker; only qualified immunity protects prosecutor acting as complaining witness); Beltran v. Santa Clara County, 514 F.3d 906, 908 (9th Cir. 2008) (social workers "are not entitled to absolute immunity from claims that they . . . made false statements in a dependency petition affidavit"); Minor, 819 N.W.2d at 399 ("social worker who files an affidavit along with a [child in need of assistance] petition acts as a complaining witness" and is not afforded absolute immunity).

Nonetheless, DCF's brief asserts that the United States Circuit Courts of Appeal "have widely held that government social workers are entitled to absolute immunity from claims related to their initiation and prosecution of child custody proceedings." DCF cites Millspaugh, 937 F.2d at 1176, in support of the position that the United States Court of Appeals for the Seventh Circuit is among those courts. Millspaugh, however, holds that "[t]he application for the initial order [to obtain custody of the children] was much like a police officer's affidavit seeking a search warrant," which "falls outside the scope of absolute immunity." DCF similarly misapprehends Miller, 335 F.3d at 892, in which the Ninth Circuit acknowledged that Kalina required the court "to clarify the narrow scope of absolute immunity." Five years after Miller, the Ninth Circuit

held in Beltran, that social workers "are not entitled to absolute immunity from claims that they . . . made false statements in a dependency petition affidavit."  Beltran, 514 F.3d at 908.  See Thomas v. Kaven, 765 F.3d 1183, 1192-1193 & n.7 (10th Cir. 2014) (does not directly address question but notes doubt that doctors who treated child would be entitled to absolute immunity for decision to seek judicial order to have child involuntarily committed to residential treatment facility).

While DCF relies on cases from some United States Circuit Courts of Appeal decisions that speak in broad terms about social worker activities performed in preparing or initiating proceedings, these cases were decided before Kalina and do not address the narrower question we face concerning factual affidavits furnished in support of a petition.  For example, Ernst v. Child & Youth Servs. of Chester County, 108 F.3d 486, 494-495 (3d Cir. 1997), cert. denied, 522 U.S. 850 (1997), held that social workers "are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings."  However, Ernst was decided before Kalina.  Moreover, Ernst did not address the question at issue:  the distinction between initiating the child protection proceeding and a supporting factual affidavit.  Indeed, in B.S. v. Somerset County, 704 F.3d 250, 267-270 (3d Cir. 2013), the

United States Court of Appeals for the Third Circuit expressly declined to answer the question of where to draw the line between a child welfare employee's investigative and prosecutorial functions.[11]

DCF's reliance on Vosburg, 884 F.2d at 135-137, is similarly misplaced.  Vosburg was decided before Kalina and did not address the distinction between the petition initiating the child removal action and a supporting factual affidavit.  Moreover, Vosburg recognized that social workers would not enjoy absolute immunity for "conduct in investigating the possibility that a removal petition should be filed."  Id. at 138.  See Brent v. Wayne County Dep't of Human Servs., 901 F.3d 656, 684-685 (6th Cir. 2018) (failing to cite Kalina);[12] Abdouch v. Burger, 426 F.3d 982, 989 (8th Cir. 2005) (addressing only initiation of judicial proceedings, not false statement in supporting affidavit).

iii.  Statements during initial hearing.  We next turn to the mother's allegations regarding Plouffe's testimony during

---

[11] B.S., 704 F.3d at 270, recognizes that a child welfare case worker's "[i]nvestigations conducted outside of the context of judicial proceedings may still be susceptible to due process claims."

[12] Brent, 901 F.3d at 685, however, would grant only qualified immunity to a social worker who "execute[s] a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order."

the initial hearing on the care and custody petition that there had been speculation that the father had "affected" the child. The mother again argues that Plouffe was functioning as a complaining witness. We disagree. As noted above, a complaining witness is one who procures an arrest or initiates a criminal prosecution. See Rehberg, 566 U.S. at 370. However, a complaining witness may then go on to testify at a hearing or trial, at which point they are entitled to absolute immunity for their testimony. Id. at 371, citing Briscoe v. LaHue, 460 U.S. 325, 326 (1983). See Aborn v. Lipson, 357 Mass. 71, 72-73 (1970) (testimony of witness in course of judicial proceeding is absolutely privileged). This absolute immunity for trial witnesses also extends to grand jury witnesses and witnesses who testify during other pretrial proceedings. See Rehberg, 566 U.S. at 375; Williams v. Hepting, 844 F.2d 138, 141-143 (3d Cir. 1988) (witness immunity applies to testimony given at pretrial hearings); Holt v. Castaneda, 832 F.2d 123, 125-126 (9th Cir. 1987) (same). Absolute privilege also extends to a witness's statement to a police officer made in the course of a criminal investigation. Correllas v. Viveiros, 410 Mass. 314, 319-320 (1991). Accordingly, we conclude that once Plouffe was testifying in court, she was no longer functioning as a

complaining witness, but as a trial witness who was thus entitled to absolute immunity.[13]

In sum, DCF workers are protected by absolute immunity in their decisions to initiate care and protection proceedings and in testifying at the subsequent hearings or trials on the petitions.  They are protected by qualified immunity, not absolute immunity, (1) in investigations they conduct and (2) regarding factual assertions they make on personal knowledge and under oath when they are acting as a complaining witness by executing an affidavit in support of a petition for care and protection of a child.

3.  DCF.  The mother also brought State and Federal procedural due process claims against DCF based on DCF's failure to provide her with some process by which to amend the safety plans.  The sole relief that the mother sought was injunctive relief in the form of an order requiring DCF to provide her with

---

[13] We note that the mother also alleged that Plouffe and Gemski acted unprofessionally prior to the filing of the petition, misstated facts during a team meeting, and violated a stipulation that the parties entered into after DCF received temporary custody of the child in 2011.  However, these claims were dismissed for reasons other than absolute immunity, and the mother does not make any arguments with respect to those other reasons on appeal.  As such, we do not address whether Plouffe and Gemski are absolutely immune for those actions.

the requested process.  The judge properly granted summary judgment to DCF on these claims.[14]

What appears to underlie the mother's desire for injunctive relief is her belief that DCF would not have made its 2009 and 2011 findings of neglect but for the existence of the first and second safety plans, which DCF claims that the mother violated by allowing the child to have unsupervised contact with the father.  The mother acknowledges in her amended complaint that "DCF has no open matters pending against" the mother and "no jurisdiction to enforce a service plan."[15]  DCF agrees that it has no open case and in the absence of an open case, DCF has no jurisdiction over the mother or the child.

The mother's proposition is that if in the future she allows the father, a registered sex offender, unsupervised access to their minor child, and if DCF is so informed, the mother will be held to answer because it was a violation of a

---

[14] Because we "treat[] the procedural due process protections of the Massachusetts and United States Constitutions identically," we do not address these claims separately. Liability Investigative Fund Effort, Inc. v. Massachusetts Med. Professional Ins. Ass'n, 418 Mass. 436, 443 (1994).

[15] This is a dispute of DCF's own making in two ways. First, by entering into the second safety plan in 2009 that allowed the father unsupervised contact with the child in an emergency, DCF created the impression that it would not be neglect if the mother left the child in the unsupervised care of the father.  Second, Plouffe previously testified by affidavit that DCF became "re-involved in June 2011 . . . due to concerns that [the father] was allowed unsupervised contact with [the child] in violation of the [second] safety plan."

voluntary safety plan that she has no mechanism to modify. Leaving aside whether the mother can withdraw from a voluntary safety plan or whether DCF is a party to the alleged 2012 safety plan, DCF's authority to act is limited to the statutory criteria set forth in G. L. c. 119, §§ 24-29.  If, in the future, the mother allows a registered sex offender unsupervised access to the minor child, and if DCF is so informed, DCF's charge would be to determine whether an incident of abuse or neglect had occurred on the facts then presented, regardless of the existence of a safety plan.  See G. L. c. 119, § 24.  See also 110 Code Mass. Regs. § 4.32 (2009); 110 Code Mass. Regs. § 2.00 (2008).

Moreover, to the extent this issue arises in the future, there are processes by which the mother may challenge any finding of neglect.  For example, the mother may challenge a finding of neglect through DCF's hearing process, see 110 Code Mass. Regs. § 10.06(11), and through judicial review of any future care and protection petitions, if any.  These processes provide the mother with the due process that she seeks.

Conclusion.  We thus affirm the judgment entered in DCF's favor.  We further affirm the judgment entered in Plouffe's and Gemski's favor to the extent the mother alleged violations of 42 U.S.C. § 1983 based on Plouffe's court room testimony, and Gemski's approval of that testimony.  However, the judgment

entered in Plouffe's and Gemski's favor is vacated to the extent that the mother alleged violations of § 1983 based on Plouffe's conduct of allegedly making false factual assertions in support of the care and protection petition and Gemski's alleged approval of that conduct.  The case is remanded for further proceedings consistent with this opinion.

So ordered.